Catherine SWENSON, Plaintiff
and Appellant,

v.

NORTHERN CROP INSURANCE, INC.,
and John Krabseth, individually,
Defendants and Appellees.

Civ. No. 920219.

Supreme Court of North Dakota.

March 24, 1993.

Nodland & Dickson, Bismarck, for plaintiff and appellant; argued by Irvin B. Nodland.

Winkjer, McKennett, Stenehjem, Reierson & Forsberg, Williston, for defendants and appellees; argued by Mark L. Stenehjem.

RALPH J. ERICKSTAD, Surrogate Judge.[1]

Catherine Swenson appeals from a summary judgment and order, entered by the District Court for Williams County, dismissing her claims of gender discrimination, equal pay violations, and intentional infliction of emotional distress. We affirm in part, reverse in part, and remand.

■ As this is an appeal from a summary judgment and order, the reviewing court must consider the facts in a light most favorable to the opposing party. *Rott v. Connecticut Gen. Life Ins. Co.*, 478 N.W.2d 570 (N.D.1991); *Volk v. Wisconsin Mortgage Assurance Co.*, 474 N.W.2d 40 (N.D.1991). Swenson began working for Northern Crop Insurance, Inc., (NCI) in February of 1986 as a clerk/secretary. The only other employee in the office at that time was Rick Wallace, the office manager. Wallace resigned in December of 1986, and recommended Swenson for the position. Swenson contends that when she approached John Krabseth, an NCI officer, its general manager, and a stockholder, about filling the position, he told her that he needed a "man fresh out of college" to fill the position, not a woman. NCI's Board of Directors disagreed with Krabseth and approved Swenson's promotion.

Subsequent to her promotion, Swenson's salary was increased from $7.50 per hour to $10.00 per hour (approximately $5,000 per year less than Wallace, a man, made in the same position). Krabseth allegedly continued making derogatory and sexist comments to Swenson concerning her gender; he persisted in saying that a man belonged in her position and that men deserved to get paid more than women, apparently because they had families to support. Krabseth supposedly threatened Swenson that he was going to replace her with a man simply because he would not tolerate a woman in a management position making a high salary.

NCI was a growing business, so Krabseth initiated a plan to expand and reorganize the office structure. Swenson contends that in conjunction with this reorganization, and in step with Krabseth's desire to remove Swenson from the management position, Krabseth demoted Swenson to her clerk/secretary position, paying her $6.00 per hour ($1.50 per hour less than she made in the same position before). He also hired two young men to fill the positions of program specialist and computer operator. They were hired at higher rates than Swenson. According to Swenson, Krabseth did not offer her the opportunity to apply for either of the positions, and he allegedly made comments pertaining to gender as being the reason for hiring the men. Krabseth did most of these actions either without the approval of NCI's Board of Directors, or he informed the Board of his actions after they were implemented. Regardless of the time when the Board gained its knowledge, it allegedly refused to help Swenson, even after she repeated her attempts to have the Board remedy Krabseth's wrongs.

During the time of the reorganization, Krabseth allegedly began purposefully avoiding Swenson, refusing to speak with her about her employment at NCI. Even when Swenson confronted him and requested meetings with him, Krabseth allegedly avoided her. It was also at this time that Swenson returned to treatment and counseling for her alcoholism. Swenson, a recovering alcoholic, believed she was experiencing so much stress at work that she needed counseling and treatment to keep from drinking again. Swenson argues that Krabseth was aware of her deteriorating emotional condition because she asked for an extra five to ten minutes during her lunch hour so she could attend Alcoholics

1. Surrogate Judge Ralph J. Erickstad was Chief Justice at the time this case was heard, and served as surrogate judge for this case pursuant to Section 27–17–03, N.D.C.C.

Anonymous meetings. At no time during Swenson's employment with NCI were there ten or more employees on NCI's payroll.

Contrary to Swenson's presentation of the facts, NCI and Krabseth argue that Swenson was demoted not as a result of her gender, but because her position was phased out during the reorganization—she was no longer needed in that capacity because the position no longer existed. They also assert that Swenson was not qualified for the two new positions, and that the new positions were different from any of her former positions. They point to her lack of formal education in the field of agriculture, and emphasize that the two young men hired had college educations and were very familiar with the agriculture industry, as was Rick Wallace. They claim that Swenson was simply deficient in the necessary qualifications for an upper-level position at NCI following its expansion.

Swenson terminated her employment and sued NCI and Krabseth in the District Court for Williams County. She claimed: (1) gender discrimination in violation of Chapter 14–02.4, N.D.C.C.; (2) violations of North Dakota's Equal Pay Act, codified in Chapter 34–06.1, N.D.C.C.; and (3) intentional infliction of emotional distress. Upon NCI and Krabseth's motion, the trial court granted summary judgment against Swenson on all three claims, dismissing her suit. This timely appeal followed.

I.

## GENDER DISCRIMINATION UNDER CHAPTER 14–02.4, N.D.C.C.

The first issue on appeal is whether or not Swenson is entitled to relief under North Dakota's anti-discrimination statutes, or in the alternative, whether or not those statutes were unconstitutional at the time of the alleged discriminatory conduct.

The anti-discrimination statutes in effect in 1986 and 1987, the time of the alleged violations, only prohibited discrimination in workplaces with ten or more employees because "employer" was defined in the Chapter as one employing "ten or more" employees. Chapter 14–02.4, N.D.C.C. (1985 and 1987).[2] Swenson's gender discrimination claim was dismissed by the trial court because less than ten people were employed at NCI when the alleged discrimination occurred.

■ The statutory definition of employer in effect in 1986 and 1987 was very clear and unambiguous. This Court is under a legislative directive to construe unambiguous statutes so that the meaning of the words are given full effect. "When the wording of a statute is clear and free of all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." Section 1–02–05, N.D.C.C. *See Wills v. Schroeder Aviation, Inc.*, 390 N.W.2d 544, 546 (N.D.1986) (legislative in-

---

**2.** Pertinent are Sections 14–02.4–01 and 14–02.4–02(5), N.D.C.C., which were in effect in 1986 and 1987. Section 14–02.4–01, N.D.C.C. (1985 and 1987), reads as follows:

"*State policy against discrimination.* It is the policy of this state to prohibit discrimination on the basis of race, color, religion, sex, national origin, age, the presence of any mental or physical disability, or status with regard to marriage or public assistance; to prevent and eliminate discrimination in employment relations, public accommodations, housing, state and local government services, and credit transactions; and to deter those who aid, abet, or induce discrimination, or coerce others to discriminate."

Subsection (5) of Section 14–02.4–02, N.D.C.C. (1985 and 1987), provides:

"5. 'Employer' means a person within the state who employs ten or more full-time employees for more than one quarter of the year,

and a person wherever situated who employs ten or more employees whose services are to be partially or wholly performed in the state."

In 1991, the North Dakota Legislative Assembly amended the definition of "employer" to include anyone employing "one or more employees." Section 14–02.4–02(5), N.D.C.C. (1991). However, prior to the amendment, only employers employing ten or more employees were prevented, under this Chapter, from discriminating on the basis of gender. The 1991 statutory amendment was not expressly retroactive; therefore, it does not aid Swenson in her argument that the anti-discrimination statutes in effect in 1986 and 1987 should apply to NCI. "No part of this code is retroactive unless it is expressly declared to be so." Section 1–02–10, N.D.C.C. *See City of Mandan v. Mi-Jon News, Inc.*, 381 N.W.2d 540 (N.D.1986), and *Reiling v. Bhattacharyya*, 276 N.W.2d 237 (N.D.1979), for an evolutionary analysis.

tent is presumed clear from the face of the statute); *Haggard v. Meier*, 368 N.W.2d 539, 541 (N.D.1985) (it is improper for courts to attempt to construe statutory provisions so as to legislate additional requirements or proscriptions which the words of the provisions do not themselves include). Thus, under the wording of Chapter 14–02.4, as it was in 1986 and 1987, the anti-discrimination statutes did not apply to NCI. The inquiry, however, does not end here.

In the alternative, Swenson asserts that if the anti-discrimination statutes did not apply to NCI in 1986 and 1987, due to the ten-employee limitation, then the statutes were unconstitutional as invidious discrimination and violative of her equal protection rights. Swenson, however, has failed to clear various procedural hurdles in presenting this argument to our Court. Not only is this part of her argument anemic on appeal due to lack of attention and support in her appellate brief, but it is unavailing because it was not raised in the trial court. In her brief to the trial court opposing summary judgment, Swenson's comments pertaining to the constitutionality of the earlier statutory definition were vague, very brief, and lacking case citation. We have repeatedly said:

> "It is well established that an issue not presented to the trial court will not be considered for the first time on appeal. *Gange v. Clerk of Burleigh County District Court*, 429 N.W.2d 429, 432 n. 3 (N.D.1988). This constraint applies with particular force to a constitutional issue. *Gange*, 429 N.W.2d at 432 n. 3; *State v. Slapnicka*, 376 N.W.2d 33, 36 (N.D. 1985). We therefore decline to address [the constitutional] argument."

*Hanson v. Williams County*, 452 N.W.2d 313, 315 (N.D.1990).

During oral argument before this Court, Swenson urged that the attention afforded the constitutional issue in the trial court was sufficient to "raise the issue below." We disagree. Swenson must do much more than acknowledge, in passing, the constitutional difficulties of a statute. We very recently reiterated the rule that parties must bring up the "heavy artillery" when asserting constitutional claims.

> "The attention given the constitutional challenge [at the trial court] was not sufficient to 'raise the issue below.' One must do more than merely assert that a statute is [unconstitutional] to appropriately raise a constitutional issue. As Justice Vogel said:
>
> > 'One who attacks a statute on constitutional grounds, defended as that statute is by a strong presumption of constitutionality, *should bring up his heavy artillery or forego the attack entirely.*'
>
> *So. Valley Grain Dealers v. Bd. of Cty. Com'rs*, 257 N.W.2d 425, 434 (N.D.1977) (emphasis added)."

*State v. Tweed*, 491 N.W.2d 412, 417 n. 5 (N.D.1992) (further emphasis added). Thus, Swenson's failure to sufficiently raise her constitutional claim in the trial court precludes her from presenting it here.[3] We affirm the trial court on the issue that Chapter 14–02.4, N.D.C.C., did not apply to NCI in 1986 and 1987.

## II.

### EQUAL PAY VIOLATIONS UNDER CHAPTER 34–06.1, N.D.C.C.

The second issue Swenson presents on appeal is that NCI violated North Dakota's Equal Pay Act by paying her less than a man for a similar job because she is a

---

**3.** Were we to reach the constitutional issue of whether or not the "ten or more" restriction constituted a violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, or of the privileges and immunities clause of Article I, Section 21, of the North Dakota Constitution, Swenson would have the burden of overcoming the principle first enunciated and applied by the United States Supreme Court in *McGowan v. State of* *Maryland*, 366 U.S. 420, 426 n. 3, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) (citing *Semler v. Oregon State Bd. of Dental Examiners*, 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086), and cited and applied by this Court in *State v. Gamble Skogmo, Inc.*, 144 N.W.2d 749 (N.D.1966). There, quoting *McGowan*, we said: "[T]he reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." 144 N.W.2d at 758.

woman. The Act establishes public policy in these words:

> "*Declaration of public policy.* The public policy of this state is declared to be that the practice of discriminating on the basis of sex by paying wages to employees of one sex at a lesser rate than the rate paid to employees of the opposite sex for comparable work on jobs which have comparable requirements unjustly discriminates against the person receiving the lesser rate; leads to low worker morale, high turnover, and frequent labor unrest; discourages workers paid at the lesser wage rates from training for higher level jobs; curtails employment opportunities, decreases workers' mobility, and increases labor costs; impairs purchasing power and threatens the maintenance of an adequate standard of living by such workers and their families; prevents optimum utilization of the state's available labor resources; threatens the well-being of citizens of this state; and adversely affects the general welfare. It is therefore declared to be the policy of this state through exercise of its police power to correct and, as rapidly as possible, to eliminate discriminatory wage practices based on sex."

Section 34–06.1–01, N.D.C.C.

█ Before we reach the merits of this issue, we must address some procedural issues raised by NCI and Krabseth concerning Swenson's response to their summary judgment motion under Rule 56, N.D.R.Civ.P. They assert that Swenson failed to present any admissible evidence on this issue to the trial court in her response to their motion, thereby violating Rule 56(e), N.D.R.Civ.P. In support of their motion for summary judgment, NCI and Krabseth submitted an affidavit of their attorney supplemented by various documents, including minutes from corporate meetings and excerpts from deposi-

tions. This is allowable under Rule 56(e), N.D.R.Civ.P. "The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits." *Id.* However, "[s]upporting and opposing affidavits must be made on personal knowledge, set forth such facts as would be admissible in evidence, and show affirmatively that the affiant is competent to testify to the matters stated therein." *Id.* In light of the motion for summary judgment with a supplemented affidavit, Swenson could not rest "upon the mere allegations or denials of [her] pleading, but [her] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *Id.* NCI and Krabseth assert that Swenson failed to comply with Rule 56(e) by not coming forward with any admissible, competent evidence, and therefore any evidence she submitted on appeal should not be considered by this Court.

█ Unfortunately, there is no transcript of the summary judgment hearing in the record for this case. However, along with her response and brief opposing summary judgment, Swenson submitted an affidavit of her attorney to the trial court. Attached thereto were significant parts of her testimony given at a deposition, excerpts from Rick Wallace's deposition testimony, and a letter from Swenson to the President of NCI. We conclude, without reciting the essence of the response and affidavits, that the mode of response was sufficient.

This determination does not end our inquiry on the issue, however, as NCI and Krabseth assert that even if Swenson's material submitted to the trial court was in compliance as to form with Rule 56(e), it still failed to prevent summary judgment because it did not raise genuine issues of material fact.[4] We disagree.

---

**4.** Rule 56, N.D.R.Civ.P., provides for summary judgment procedure. Subsection (c) indicates when summary judgment is appropriate.

> "*Motion and Proceedings Thereon.* The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve oppos-

ing affidavits. Judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law. A summary

In reviewing Swenson's evidence provided to the trial court, we find three men receiving higher pay than Swenson. The first man, Rick Wallace, received $25,000 per year as the office manager, and Swenson received approximately $20,000 per year in that same position. Swenson does not dispute this pay difference because, "I was not, um, going to be doing the technical part of it, the assisting the agents if they had technical questions."

The second man, Tom Hove, was hired as a program specialist before Swenson terminated her employment with NCI. Concurrent with Hove's hiring, Swenson was demoted and received a pay decrease from $10.00 per hour to $6.00 per hour ($1.50 per hour less than she received before in the clerk/secretary position). Swenson had "no questions or qualms or anything about [Hove's] salary and his wages." She said: "I was very unqualified for that job and I knew that. That was assistance to the agents." Her concern is with the dramatic decrease in her pay while retaining many of the same responsibilities she had prior to the pay decrease. Additionally, according to her, Krabseth expressed his views on wages for women in this fashion:

"I distinctly remember him saying something about, 'I know I can hire a woman cheaper, but I want a man.' "

"I'd say, 'Why a man?' 'Because a woman should not get $10 an hour.' "

"I told him that, if he did demote me down to six, something like—how did the conversation go? He had already told me, you know, that he didn't feel a woman needed ten dollars an hour, you know, to survive and stuff. It should be a man."

"[H]e said he was going to be hiring a man; that he'd be starting the man at, 'A higher wage than you're getting because he's a man.' "

"And he kept telling me that, you know, men needed more, you know, supporting the family and—and that he just didn't see that a woman should get $10 an hour."

The third man, Terry Skarphol, was hired as a computer operator one month before Swenson terminated her employment with NCI. Swenson asserts that Krabseth did not inform her of this new position, so she could not apply for it. Skarphol was also hired at a rate higher than Swenson. Additionally, Krabseth offered Skarphol training for the job. Swenson argues that she was qualified for that job, did not need training as to NCI's existing computer system, and would have welcomed any further training available. Swenson claims that Krabseth hired Skarphol and paid him a higher rate because he is a man.

All of these allegations are material facts in the equal pay claim. NCI and Krabseth assert that the three men were much more qualified, thereby justifying higher salaries. Furthermore, NCI and Krabseth argue that Swenson's position as office manager was phased out during the reorganization, thereby justifying her demotion to clerk/secretary. Because there are material facts in dispute as to the equal pay claim under Chapter 34-06.1, N.D.C.C., it was improper for the trial court to grant summary judgment on this issue. We therefore reverse this part of the judgment and remand for a determination of Swenson's equal pay claim.[5]

judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages. Summary judgment, when appropriate, may be rendered against the moving party."
Rule 56(c), N.D.R.Civ.P.

5. The prohibition against discrimination is set forth in the Equal Pay Act in this manner:

"Prohibition of discrimination. No employer may discriminate between employees in the same establishment on the basis of sex, by paying wages to any employee in any occupation in this state at a rate less than the rate at which he pays any employee of the opposite sex for comparable work on jobs which have comparable requirements relating to skill, effort, and responsibility, but not to physical strength. Differentials which are paid pursuant to established seniority systems, job descriptive systems, merit increase systems, or executive training programs, which do not discriminate on the basis of sex, are not within this prohibition. An employer who is paying a wage differential in violation of this chapter may not, in order to comply with it, reduce the wage rates of any employee. No

## III.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Swenson's last issue on appeal is whether or not the trial court erred in granting summary judgment on the tort claim of intentional infliction of emotional distress. We hold that summary judgment was improper as to this issue, and reverse and remand.

The leading case in North Dakota on the tort of intentional infliction of emotional distress is *Muchow v. Lindblad*, 435 N.W.2d 918 (N.D.1989). In our discussion of the tort, we enumerated its three elements.

"There are three elements of the tort of intentional infliction of emotional distress under Section 46 [of the Restatement (Second) of Torts]: (1) extreme and outrageous conduct that is (2) intentional or reckless and that causes (3) severe emotional distress."

*Id.* at 923–24.

In both the trial court brief in support of summary judgment and their appellate brief to this Court, NCI and Krabseth argue that summary judgment was proper because Swenson completely failed to establish the first element of the tort—extreme and outrageous conduct. "At best, the alleged actions by Krabseth expressed a preference for a male worker. Such comments at their worst could be viewed as insults to females." The trial court granted summary judgment for NCI and Krabseth because it agreed with them "that the errant conduct alleged is not so outrageous and extreme as to go beyond all possible bounds of decency and to be regarded as atrocious."

In *Muchow*, we examined authority defining extreme and outrageous conduct.

"Comment d. of the Reporter's Notes of § 46 of the Restatement describes the substance of the element of extreme and outrageous conduct and makes clear that

it is narrowly limited to outrageous conduct which exceeds 'all possible bounds of decency':

'The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that [the defendant] has intended to inflict emotional distress, or even that [the defendant's] conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse [that member's] resentment against the actor, and lead [the member] to exclaim, 'Outrageous!'

'The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt.'"

*Muchow v. Lindblad*, 435 N.W.2d at 924.

The plaintiffs in *Muchow* were family members of a woman whose body was found in the river. They brought an action for intentional infliction of emotional distress against the investigating police offi-

person may cause or attempt to cause an employer to discriminate against any employee in violation of this chapter. No employer may discharge or discriminate against any employee by reason of any action taken by

such employee to invoke or assist in any manner the enforcement of this chapter, except when proven that the act of such employee is fraudulent."
Section 34–06.1–03, N.D.C.C.

cer. The officer had previously arrested the woman for shoplifting and had investigated a theft of money from her. At the time of her arrest, she told the officer that her family did not love her and that she was going to kill herself by "walking in the river." *Id.* at 919. After discovery of her body in the river, the officer did not conduct any serious investigation, despite obvious signs of foul play. He assumed that the woman committed suicide and told the coroner the same; therefore, an autopsy was not immediately performed. Further, he described the grim details of the woman's suicide to the plaintiffs, telling them that her body was found nude, when in fact her body was partially clothed. After learning objective evidence of foul play, the plaintiffs questioned the officer about the cause of the woman's death. The officer then accused the plaintiffs of questioning him merely to assuage their feelings of guilt for not having loved and supported the woman. Approximately one month after the woman's death, the plaintiffs had her body exhumed, and an autopsy was performed establishing that the woman had died from strangulation.

Although we agreed with the plaintiffs that the officer's investigation might have been negligent, we did not agree that his actions could "reasonably be regarded as outrageous in character and extreme in degree so as to exceed all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community." *Id.* at 924. We sustained the trial court's summary judgment dismissal of the complaint of intentional infliction of emotional distress. The *Muchow* facts and holding are illustrative of the rigorous standard we apply when defining "extreme and outrageous conduct." Such conduct is not easy to demonstrate.

■ When faced with a claim for intentional infliction of emotional distress, where one side is asserting lack of extreme and outrageous conduct, the trial court has an important and primary role.

"It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable [people] may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability."

*Id.* (quoting Restatement (Second) of Torts § 46 cmt. h (1965)).

■ *Muchow* and the instant case are distinguishable in a very fundamental way. In *Muchow*, the defendant had been told by the decedent herself that she wanted to walk into the river to end her life. It was not outrageous for the defendant, as investigating officer, to believe that she had carried out her plan when her body was found in the river. There was a basis for his assumptions and actions. However, when viewing the present facts in the light most favorable to Swenson, as we must do when considering her appeal from a summary judgment dismissing her complaint, we conclude that reasonable persons could differ in their conclusion as to whether or not the conduct of NCI and Krabseth was extreme and outrageous.

According to Swenson, during her employment as clerk/secretary, her work product was impeccable, with some of the lowest report error rates in the nation. Furthermore, while Swenson was in the office manager position, Krabseth allegedly told her that he never had any complaints about her performance, and that he was not demoting her because of her work. Swenson also asserts that Krabseth, as her employer, discriminated against her and oppressed her repeatedly, not because of the quality of her work, but because of her gender. She says that he continually reminded her that he was pursuing a plan to replace her with men. She also claims that he said that men were worth more pay because they were men and had to support families, and that when Swenson pointed out to Krabseth that she was single with a family to support, it did not seem relevant to him.

Swenson maintains that upon reorganizing the office structure of NCI, Krabseth

demoted her to her old position of clerk/secretary, paying her less than she previously made in that position, while simultaneously hiring a man at a higher rate than she received in the office manager position. Initially, Swenson suffered a 40% loss in wages.[6] After the passage of a short period of time, Krabseth hired a second young man for a job which Swenson claims she was more than qualified to fill. She asserts that Krabseth failed to give her notice of the position, and thus she could not apply. According to Swenson, the second man hired also received more pay than she received. Swenson asserts that she was then relegated to answering the phone, typing, and filing for two men in positions that her former position had been equal to or greater than in status.

In addition to all of these factors, during the period in which Krabseth was reorganizing, he allegedly isolated Swenson by not talking to her, by refusing to set up meetings with her to discuss her employment with NCI, and by virtually avoiding any contact with her whatsoever. Furthermore, Swenson claims that Krabseth was well aware of her unstable emotional condition, which had developed during her employment at NCI. She contends that she experienced so much stress at work that it became necessary for her to request permission to attend AA meetings during her lunch hour so that she could remain alcohol-free.

Considering the facts as presented by Swenson, we believe the trial court erred in granting summary judgment in favor of NCI and Krabseth on the issue of extreme and outrageous conduct. When the facts are judged under the "reasonable person" standard, we cannot, as a matter of law, conclude that reasonable persons would not differ as to whether or not the conduct complained of was extreme and outrageous.

In reaching our decision, we are fully aware that a number of jurisdictions might hold contrary to our decision today. These are the courts that have rigidly applied the test of extreme and outrageous conduct to situations of discrimination in employment settings, requiring much more than just discriminatory conduct.[7] However, there

---

**6.** Eventually, Swenson's salary decrease was remedied by NCI's Board of Directors. It increased her pay in the clerk/secretary position back to $7.50 per hour, stating that the $6.00 per hour salary was a mistake. However, Swenson says she brought the discrepancy to Krabseth's attention when he informed her of the salary reduction, yet he still persisted in paying her the $6.00 wage. Swenson claims that it was the Board, and not Krabseth, that finally remedied the problem at a later date.

**7.** See, e.g., Spence v. Maryland Casualty Co., 803 F.Supp. 649 (W.D.N.Y.1992) (among other things, employee was harassed and taunted by supervisors about his age, but this was not enough to equal extreme and outrageous conduct); Ramirez v. Allright Parking El Paso, Inc., 970 F.2d 1372 (5th Cir.1992) (employee was demoted from parking lot manager to parking lot attendant and had to do menial tasks because of his age, but he was still paid a supervisor's salary for awhile; held not extreme and outrageous); Katzer v. Baldor Electric Co., 969 F.2d 935 (10th Cir.1992) (firing an employee just because he was handicapped was not extreme and outrageous conduct under tort of intentional infliction of emotional distress); Meek v. Michigan Bell Telephone Co., 193 Mich.App. 340, 483 N.W.2d 407 (1991) (cruel sexist remarks and religious degradation from supervisor to female employee was not extreme and outrageous conduct); Wilson v. Monarch Paper Co., 939 F.2d 1138 (5th Cir.1991) (the only factor which made the employer's conduct extreme and outrageous was that it required a 30-year executive to spend 75% of his time cleaning up after former subordinates, otherwise all other instances of age discrimination were not extreme and outrageous); Daemi v. Church's Fried Chicken, Inc., 931 F.2d 1379 (10th Cir.1991) (it was not extreme and outrageous for employer to make racial slurs, be derogatory, or demote employee on the basis of race and national origin); James v. International Business Machines Corp., 737 F.Supp. 1420 (E.D.Pa.1990) (discriminatory conduct alone based on race and gender was not extreme and outrageous); Leibowitz v. Bank Leumi Trust Co., 548 N.Y.S.2d 513 (1989) (religious and ethnic slurs and sexual discrimination were not extreme and outrageous conduct); Dean v. Ford Motor Credit Co., 885 F.2d 300 (5th Cir.1989) (the incident making the employer's conduct extreme and outrageous was the placing of missing checks in the employee cashier's purse and cash box to make her appear to be a thief, otherwise all other harassing and inequitable conduct was not extreme and outrageous); Wells v. Thomas, 569 F.Supp. 426 (E.D.Pa.1983) (stripping a 25-year employee of her desk, office, and support staff, allowing her phone calls to go unanswered, giving her poor performance evaluations for the first time in 25 years, and

are also numerous jurisdictions which have held that evidence of most *any* type of discriminatory conduct may be sufficient to withstand a motion for summary judgment brought on the issue of the lack of extreme and outrageous conduct.[8]

We are cognizant that the numerous cases cited in footnotes 7 and 8 deal primarily with racial or age discrimination rather than sexual discrimination. However, we believe the cases are still pertinent to our analysis of what is required to prevent a summary judgment dismissal of a claim for intentional infliction of emotional distress when one is considering if a jury could disagree as to whether or not the alleged facts disclose extreme and outrageous conduct.

We are also aware that the discriminatory language allegedly used by Krabseth is somewhat milder than the language used in several of the cases cited in footnotes 7 and 8. *See, e.g., Leibowitz v. Bank Leumi Trust Co.,* 152 A.D.2d 169, 548 N.Y.S.2d 513 (1989); *Franklin v. Portland Community College,* 100 Or.App. 465, 787 P.2d 489 (1990); *Gomez v. Hug,* 7 Kan.App.2d 603, 645 P.2d 916 (1982). In the facts asserted by Swenson, Krabseth did not use expletives or call her names. Contrarily, in some of the cases previously cited, the denigration was couched in more colorful terms. However, Krabseth's alleged statements were blunt and blatant; their meaning was unambiguous. He, according to Swenson, minced no words in explaining his feelings and plan to Swenson. The fact that he did not swear or resort to name-calling does not affect the allegation that he acted in a discriminatory manner. The fact that he "made [his] statement politely does not negate its effect on [Swenson]." *Johnson v. Hale,* 940 F.2d 1192, 1194 (9th Cir.1991) (although this case did not involve a claim for intentional infliction of emotional distress, it did involve a comparable claim for punitive damages under § 1982).

---

**8.** *See, e.g., Mass v. Martin Marietta Corp.,* 805 F.Supp. 1530 (D.Colo.1992) (a pattern of alleged racial comments and writings by co-employees and supervisors aimed at an employee justified denial of summary judgment on issue of extreme and outrageous conduct); *Dreith v. National Football League,* 777 F.Supp. 832 (D.Colo. 1991) (allegations of age discrimination resulting in employee's humiliation, demotions, and degradation was sufficient to justify the conclusion that reasonable jurors could differ on whether conduct was extreme and outrageous); *Woods v. Graphic Communications,* 925 F.2d 1195 (9th Cir.1991) (judgment based on union's discriminatory practices against worker involving racial jokes, comments, and cartoons, upheld as outrageous); *Guzman v. El Paso Natural Gas Co.,* 756 F.Supp. 994 (W.D.Tex.1990) (denying an employee promotions, perks, comparable office, furniture, and staff based on his race was sufficient basis for denying summary judgment on the issue of extreme and outrageous conduct); *Franklin v. Portland Community College,* 787 P.2d 489, 490 (Or.1990) (Oregon court of appeals said: " 'a continuing pattern of discrimination and retaliation' toward plaintiff, including these acts: Issuing false reprimands, shoving him, using the racial epithet 'boy,' failing to recommend training, attempting to lock him in Hankins' office, and suggesting that he apply for a job at another employer" was sufficient to state a cause of action for intentional infliction of emotional distress); *Beeman v. Safeway Stores, Inc.,* 724 F.Supp. 674 (W.D.Mo.1989) (allegations of subtle sexual discriminatory conduct directed toward an employee raised genuine issue of material fact); *Butler v. Westinghouse Electric Corp.,* 690 F.Supp. 424 (D.Md. 1987) (although this case was dismissed on other grounds, the court held that the discriminatory conduct in reprimanding a black employee more severely than a white employee for similar bad acts on the job may be found by some to be extreme and outrageous conduct, and therefore, should go to the jury); *Robinson v. Hewlett–Packard Corp.,* 183 Cal.App.3d 1108, 228 Cal. Rptr. 591 (1986) (racial slurs aimed at an employee who was susceptible to such slurs presented a question of material fact as to whether the discriminatory conduct was extreme and outrageous); *Gomez v. Hug,* 7 Kan.App.2d 603, 645 P.2d 916 (1982) (where employee suffered brunt of superior's racial slurs, such discriminatory conduct became an issue for jury to determine whether it was extreme and outrageous); *Agarwal v. Johnson,* 25 Cal.3d 932, 160 Cal.Rptr. 141, 603 P.2d 58 (1979) (discriminatory conduct and humiliation of employee was extreme and outrageous justifying verdict of jury); *Contreras v. Crown Zellerbach Corp.,* 88 Wash.2d 735, 565 P.2d 1173 (1977) (demotions, humiliation, scorn, and ridicule based on employee's race created a question of fact regarding issue of extreme and outrageous conduct); *Alcorn v. Anbro Engineering, Inc.,* 2 Cal.3d 493, 86 Cal. Rptr. 88, 468 P.2d 216 (1970) (racial slurs and other discriminatory conduct directed at the employee was a question for the jury).

terminating her possibly on the basis of her age was not extreme and outrageous).

Furthermore, there are several cases cited in footnote 8 which involve similar facts to those claimed by Swenson, lacking name-calling and expletives, that found the discriminatory conduct to be an issue for the jury on the question of extreme and outrageous conduct. *See Dreith v. National Football League*, 777 F.Supp. 832 (Colo.1991); *Guzman v. El Paso Natural Gas Co.*, 756 F.Supp. 994 (Tex.1990); *Butler v. Westinghouse Electric Corp.*, 690 F.Supp. 424 (Md.1987); *Robinson v. Hewlett–Packard Corp.*, 183 Cal.App.3d 1108, 228 Cal.Rptr. 591 (1986).

However, in reaching our decision in this case, we do not focus *exclusively* on the discriminatory conduct and words alleged by Swenson; nor do we base our conclusion solely on those facts alone. We also view and consider the context and background in which those words and conduct occurred. Thus, it is not the alleged facts of discrimination alone, but the combination of those facts with other facts alleged by Swenson, involving two additional elements, which influence our conclusion in this case.

■ For the first additional element, it is important to remember that throughout the entire scenario presented by Swenson, she was a subordinate employee to Krabseth. The position of the parties is relevant when examining the facts for instances of extreme and outrageous conduct.

"There are some situations in which courts recognize that the parties' relationship to each other can help determine whether the acts complained of are outrageous. It is only natural that a defendant's position of power over a plaintiff may enhance his or her ability to do harm. The *Restatement* [ (Second) of Torts] recognizes this reality in § 46, Comment e:

'The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests. Thus an attempt to extort money by a threat of arrest may make the actor liable even where the arrest, or the threat alone, would not do so. In particular police officers, school authorities, landlords, and collecting creditors have been held liable for extreme abuse of their position. Even in such cases, however, the actor has not been held liable for mere insults, indignities, or annoyances that are not extreme or outrageous.'

Although the *Restatement* does not specifically say that employer-employee relationships are governed by this rule, [many] courts have held or implied that they are."

*Kentucky Fried Chicken Nat'l Management Co. v. Weathersby*, 326 Md. 663, 607 A.2d 8, 14–15 (1992). For cases dealing with discriminatory conduct in the workplace that apply this Restatement comment to the employer/employee relationship, *see, e.g.: Franklin v. Portland Community College*, 787 P.2d 489; *Robinson v. Hewlett–Packard Corp.*, 228 Cal.Rptr. 591; *Gomez v. Hug*, 645 P.2d 916; *Agarwal v. Johnson*, 25 Cal.3d 932, 160 Cal.Rptr. 141, 603 P.2d 58 (1979); *Contreras v. Crown Zellerbach Corp.*, 88 Wash.2d 735, 565 P.2d 1173 (1977); *Alcorn v. Anbro Engineering, Inc.*, 2 Cal.3d 493, 86 Cal.Rptr. 88, 468 P.2d 216 (1970).

■ While we are not saying that employers should be subject to a lesser standard of conduct for this tort, we believe that the relationship of employer/employee is an important factor to consider. In *Bodewig v. K–Mart, Inc.*, 54 Or.App. 480, 635 P.2d 657 (1981), although not involving discriminatory conduct, but involving an employer/employee relationship (or supervisory/subservient relationship), the court said: "An employer has even more authority over an employee [than a landlord has over a tenant], who, by the nature of the relationship, is subject to the direction and control of the employer and may be discharged for any or no reason, absent an agreement restricting that authority. Clearly, that relationship is not an arm's length one between strangers."[9] *Id.* 635 P.2d at 661.

**9.** In *Bodewig,* the employee was subjected to a strip search in a public washroom by a supervi-

■ The second additional element which is significant is Krabseth's alleged knowledge of Swenson's deteriorating emotional condition. That knowledge influences our view of the conduct alleged.

"Comment f [Restatement (Second) of Torts, § 46] states that the extreme and outrageous character of the conduct 'may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity.' The comment continues:

'The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know.' "

*Harris v. Jones*, 281 Md. 560, 380 A.2d 611, 615 (1977). For cases involving discriminatory conduct in the workplace that consider this factor, *see Woods v. Graphic Communications*, 925 F.2d 1195 (9th Cir.1991); *Robinson v. Hewlett–Packard Corp.*, 228 Cal.Rptr. 591; *Agarwal v. Johnson*, 603 P.2d 58; *Alcorn v. Anbro Engineering, Inc.*, 468 P.2d 216. Thus, knowledge of a plaintiff's susceptibility to distress, while not per se conclusive of extreme and outrageous conduct, is relevant in determining whether the conduct is extreme and outrageous.

■ We consider the above factors because it is important not to view the alleged extreme and outrageous conduct in a vacuum. "In determining whether conduct is extreme and outrageous, it should not be considered in a sterile setting, detached from the surroundings in which it occurred." *Harris v. Jones*, 380 A.2d at 615. Instead of applying a bright-line rule, each set of facts should be judged on a case-by-case basis. *Franklin v. Portland Community College*, 787 P.2d at 493. Where there is a chance that reasonable minds might differ, the plaintiff has the right to present the case to the jury. *Gomez v. Hug*, 645 P.2d at 922.

As previously implied, we believe our decision in this case will be praised by some jurisdictions, and much criticized by others. However, we believe the more enlightened view to be that of the courts we have cited with approval. This view, which discourages the intentional infliction of emotional distress, is more persuasive and better attuned to our changing social conditions and awareness. "Changing sensitivity in society alters the acceptability of former [conduct]." *Contreras v. Crown Zellerbach Corp.*, 565 P.2d at 1177. *See also Woods v. Graphic Communications*, 925 F.2d at 1204; *Robinson v. Hewlett–Packard Corp.*, 228 Cal.Rptr. at 604; *Alcorn v. Anbro Engineering, Inc.*, 468 P.2d at 219.

Furthermore, in modern-day America, we realize that not only are all people created equal, but that the trend in the courts, including ours, is to expand upon that principle. *See, e.g., Butz v. World Wide, Inc.*, 492 N.W.2d 88, 90 n. 2 (N.D.1992) (wives, as well as husbands, may bring actions for loss of spousal consortium); *Hastings v. James River Aerie No. 2337, Etc.*, 246 N.W.2d 747, 749–52 (N.D.1976) (it would be unconstitutional to treat women differently from men in an action for loss of spousal consortium); *Moses v. Burleigh County*, 438 N.W.2d 186, 188–92 (N.D.1989) (the terms of an employment contract cannot constitute a waiver of or excuse for unlawful gender and racial discrimination); *Briese v. Briese*, 325 N.W.2d 245, 247–49 (N.D.1982) (there is an economic partnership between a husband and a wife during marriage).

In reversing the summary judgment dismissal of this issue, we are not espousing the view that every instance of discrimination equals or constitutes extreme and outrageous conduct as a matter of law. Instead, we are saying that in this case it is unclear whether the alleged conduct is extreme and outrageous, or, in other words, we believe that reasonable persons could disagree as to that issue. Therefore, it is a question for the jury and an improper issue for summary judgment. We accordingly

sor to convince a complaining customer that the employee did not have the customer's misplaced

$20.

reverse the judgment as to this issue, and remand for trial.[10]

For the foregoing reasons we affirm the District Court for Williams County on the statutory gender discrimination issue, we reverse the summary judgment and remand on the issues of equal pay under the statute and the tort of intentional infliction of emotional distress.

MESCHKE, J., concurs in the result.

Justice J. PHILIP JOHNSON, who was a member of the Court when this case was heard, did not participate in this decision.

Justice NEUMANN and Justice SANDSTROM, not being members of the Court when this case was heard, did not participate in this decision.

LEVINE, Justice, specially concurring.

I join in the majority opinion, while registering but one small difference. I am not prepared to say in this case, that sex discrimination in obtaining employment or a promotion, without more, may not constitute sufficiently outrageous conduct to raise a jury question. With that difference noted, I concur in the rest of the opinion authored by former Chief Justice Erickstad.

Discrimination "deprives persons of their individual dignity...." *Roberts v. United States Jaycees,* 468 U.S. 609, 625, 104 S.Ct. 3244, 3253, 82 L.Ed.2d 462 (1984). Sex discrimination is based on "archaic and overbroad assumptions" about the needs and capacities of women, stereotypical notions that "often bear no relationship to [a person's] actual abilities." *Id.* 468 U.S. at 625, 104 S.Ct. at 3253. There are countless examples of the exclusion of women from all walks of life because of the biased view that women are less able than men. *Mississippi University for Women v. Hogan,* 458 U.S. 718, 725 n. 10, 102 S.Ct. 3331, 3336 n. 10, 73 L.Ed.2d 1090 (1982). One strikes close to home.

Myra Bradwell could not practice law.[1] *Bradwell v. Illinois,* 16 Wall 130, 21 L.Ed.

---

**10.** Because the issues were neither briefed nor argued in this Court, we have not considered the possible effect of such things as: (1) wrongful discharge and possibly constructive discharge of an at-will employee, *compare Wilson v. Monarch Paper Co.,* 939 F.2d at 1148, *with Spence v. Maryland Casualty Co.,* 803 F.Supp. at 672; (2) the exclusivity provision of our Workers' Compensation Act, Chapters 65–04 and 65–05, N.D.C.C., *compare Price v. Philadelphia Electric Co.,* 790 F.Supp. 97, 100 (E.D.Pa.1992), *with James v. International Business Machines Corp.,* 737 F.Supp. at 1427; (3) the exhaustion of administrative remedies, *see Mass v. Martin Marietta Corp.,* 805 F.Supp. at 1541; (4) the possible distinctions between the corporate liability and individual liability of the defendants, *compare Agarwal v. Johnson,* 603 P.2d at 67, *with Gomez v. Hug,* 645 P.2d at 925.

**1.** Ms. Bradwell had lots of company. Her sister-in-arms, Lavinia Goodell, met the same fate in Wisconsin in 1876. *The Application of Miss Lavinia Goodell,* 39 Wis. 232 (1876). Goodell's case commands special attention as a paradigm of conventional thinking about women. Chief Justice Ryan, in a unanimous opinion for himself and the two justices who then comprised the Wisconsin Supreme Court, denied Goodell's application squarely on the basis of her sex. He explained, in excruciating detail, the common law tradition of excluding women from the profession of law, because:

"The law of nature destines and qualifies the female sex for the bearing and nurture of the children of our race and for the custody of the homes of the world and their maintenance in love and honor. And all life-long callings of women, inconsistent with these radical and sacred duties of their sex, as is the profession of the law, are departures from the order of nature; and when voluntary, treason against it...."

As for lawyerly skills, women were found sorely deficient:

"There are many employments in life not unfit for female character. The profession of the law is surely not one of these. The peculiar qualities of womanhood, its gentle graces, its quick sensibility, its tender susceptibility, its purity, its delicacy, its emotional impulses, its subordination of hard reason to sympathetic feeling are surely not qualifications for forensic strife. Nature has tempered woman as little for the juridical conflicts of the court room, as for the physical conflicts of the battle field. Womanhood is moulded for gentler and better things...."

One might ask, but I won't, whether women's record of accomplishments in "the juridical conflicts of the court room" does not pierce Chief Justice Ryan and the common law's view, shared by a few others, that women are not qualified for the battlefield. Actually, given Chief Justice Ryan's sentiment that the practice of law is filled with "all that is selfish and malicious, knavish and criminal, coarse and brutal, repulsive and obscene ...," it is small wonder anyone would willingly undertake it!

442 (1873). It may be that no reasonable jury in 1873 would have found Bradwell's exclusion outrageous. But, surely, the same cannot be said about juries in 1993. Fortunately, former custom does not prevent present practice from constituting extreme and outrageous conduct. *See Alcorn v. Anbro Engineering, Inc.*, 2 Cal.3d 493, 86 Cal.Rptr. 88, 91 n. 4, 468 P.2d 216, 219 n. 4 (1970) [racial epithets by one in position of authority states a claim for relief for the intentional infliction of emotional distress].

The outrageous conduct necessary to prove the intentional infliction of emotional distress is conduct that is so extreme in degree "as to go beyond all bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 comment d (1965). The conduct must be, to use the vernacular, "really gross." It must substantially offend community notions of acceptable conduct. *Grandchamp v. United Air Lines*, 854 F.2d 381 (10th Cir.1988).

Is sex discrimination fairly regarded as "atrocious and utterly intolerable in a civilized community"? The answer must derive not alone from the act of sex discrimination but from the impact of that act on its victim. Sex discrimination debases, devalues and despoils. When we cannot do anything to overcome another's criticism, hatred or contempt, we are, in effect, struck twice: first, by the act and, second and equally devastating, by the realization that we are helpless to undo that act, overcome it or change it. This is particularly true in a workplace. *See Robinson v. Jacksonville Shipyards, Inc.*, 760 F.Supp. 1486, 1505–07 (M.D.Fla.1991). As the majority points out, sex discrimination in the workplace constitutes an abuse of power by one in a superior position over one who is vulnerable and powerless. As children, we learned that lightning does not strike twice. As adults, we must conclude that discrimination surely does. An employee, like Swenson, who is eliminated solely because of her sex is laid low, first by the irrational, discriminatory conduct and then, by the inability to do anything about it. Indeed, victims, like Swenson, often need reassurance that it is not their fault that employers have discriminated against them. *See* Susan Martin, *Sexual Harassment: The Link Joining Gender Stratification, Sexuality and Women's Economic Status*, in Women: A Feminist Perspective 57, 62 (Jo Freeman ed., 4th ed. 1989). Discrimination is not a tale of hurt feelings, unkind behavior or inconsiderate conduct by one against another. *Compare Muchow v. Lindblad*, 435 N.W.2d 918 (N.D. 1989). That it may insult is irrelevant; that it strips its victim of self-esteem, self-confidence and self-realization is the nub of its evil and the stuff of its outrageousness. As a subscriber to Oliver Wendell Holmes' belief that experience (not logic) fuels the engine of the law, and as a member of a class that has been subjected to discrimination, I find it difficult to understand how, at least, some members of the jury, whom we would all agree were reasonable members of their community, would not agree that sex discrimination, like race discrimination, goes beyond all bounds of decency and is truly atrocious and utterly intolerable in a civilized community. *Compare* Wendy Pollack, *Sexual Harassment: Women's Experience vs. Legal Definitions*, 13 Harvard Women's L.J. 35, 53 (Sp.1990) [legal concept of reasonable "man" standard or gender-neutral standard does not work in sexual harassment cases because it fails to recognize "male dominance" within "the larger phenomenon of gender hierarchy."].

And it is the jury that determines whether the challenged conduct is outrageous. *E.g., Dreith v. National Football League*, 777 F.Supp. 832 (D.Colo.1991). The court only decides the preliminary issue whether reasonable persons could differ on whether the conduct is outrageous. *Id.* It seems to me that if reasonable judges can disagree on whether or not sex discrimination is

Over three years later, Goodell reapplied for admission to practice before the Wisconsin Supreme Court. *Application of Goodell*, 48 Wis.

693, 81 N.W. 551 (1879). The Court, enlarged to five members, granted her application. Chief Justice Ryan dissented!

outrageous, then reasonable jurors can, too. They should be given the opportunity to consider the question and plaintiff should be given the opportunity to educate, persuade and convince the jury in this case, that the alleged sex discrimination has no place in our society and is outrageous, extreme and wholly intolerable. The jury can take into account our changing social mores, the development of civil-rights law, and plaintiff's susceptibility as a member of a vulnerable class which has been historically discriminated against, to decide whether the conduct, that is, the sex discrimination, directed at plaintiff, constitutes the outrageous conduct necessary for plaintiff to prevail. *See Contreras v. Crown Zellerbach Corp.*, 88 Wash.2d 735, 565 P.2d 1173 (1977). Only then will there be a fair resolution of the question of whether defendant's conduct substantially offends the community's notions of acceptable conduct. And that answer will be better provided by the representatives of the parties' community, the jurors, who likely have a keener aptness for judging their community's mores than either the trial court or this court.

The Supreme Court held in *Bradwell* that a statute describing "persons" who could practice law excluded females. That interpretation, however, must be viewed in the context of the legal culture of the time with its cabal of customary beliefs and complex of tradition about women and their separate sphere. The exclusion of women rested on the belief that men, simply because they were men, belonged in the public sphere rife with power and status, and women, in the private sphere—the home. *See generally*, Debra L. Rhode, *The "No-Problem" Problem: Feminist Challenges and Cultural Change*, 100 Yale L.J. 1731 (1991) [describing nineteenth-century-separate-spheres ideology]. Myra Bradwell could not practice law because of that prevailing view, espoused by Justice Bradley in his concurring opinion, that women did not have the "special skill and confidence" required of lawyers, because of women's "peculiar characteristics, destiny, and mission...." *Bradwell, supra* at 16 Wall 142. Fortunately, that stereotypical notion of

women's "proper place" was abandoned and women in increasing numbers now engage in the practice of law. Inaugurating this State's tradition, Helen Hamilton, the first woman graduate of the University of North Dakota School of Law, was described in information published in honor of her graduating class of 1905:

"She with all the charm of woman, She with all the breadth of man."

*See* U.N.D. Law Women's Caucus Pamphlet, Eleventh Annual Helen Hamilton Day, Mar. 4, 1993.

Today, if Helen Hamilton, charm and breadth notwithstanding, were unable to get a position because of sex discrimination, she would at least have the opportunity to right that wrong by having her day in court. She should be able to get to the jury with evidence of sex discrimination, defendant's intent or reckless disregard and her severe emotional distress and she should be able to prevail if she establishes those three elements of the tort by a preponderance of the evidence. To do that, she will have to have successfully eliminated from the jury those folks who just don't get it. It may well be that stereotypes about the "proper place" of women and their need for special treatment, like old soldiers, have not died. The jury can tell us if they have faded away.

VANDE WALLE, Chief Justice, concurring and dissenting.

I agree with the majority's disposition of Issues I and II. I dissent as to issue III, the intentional infliction of emotional distress. I cannot reconcile the language adopted from the Restatement in *Muchow v. Lindblad*, 435 N.W.2d 918, 924 (N.D. 1989), "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," with Swenson's alleged facts in this instance.

If those words from *Muchow* are to form the basis of an instruction to the jury on the definition of intentional infliction of emotional distress, then in order to reverse the summary judgment, they assume a

meaning other than their ordinary meaning. If Swenson's alleged facts constitute conduct so outrageous in character and so extreme in degree as to go beyond *all possible* bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community, we will need to devise a new tort to encompass conduct that comes within the commonly accepted definition of those terms.

I have a great concern that the precedent established by the majority significantly expands the scope of the tort not only in sexual harassment cases but in cases involving conduct society considered as being unacceptable but not meeting the *Muchow* definition as it was heretofore understood. The majority acknowledges that a number of jurisdictions require much more than discrimination in employment settings. It candidly admits that the cases to the contrary, and upon which it relies, are stronger on their facts than are the facts in this case, even when viewed in a light most favorable to Swenson.

Assuming, as we must, for purposes of this appeal, that Swenson's allegations are true, I am also concerned my dissent will be viewed as condoning, or if not condoning, at least tolerating, Krabseth's conduct. Neither is true. Such conduct cannot be tolerated and must be condemned. One of the ways to show not only a lack of tolerance but condemnation for such conduct would be to conclude that the alleged conduct falls to the extreme defined by the language in *Muchow.*

But the lack of tolerance and condemnation of the conduct is not the issue before us. Rather, it is whether or not, as a matter of law, the conduct fits the definition of intentional infliction of emotional distress as defined by *Muchow.* I cannot conclude that it does. Although in this instance, I am tempted to let the end justify the means, that is not good policy. If the courts are to be the engine for social change they should focus the scope of the alteration in a manner which does the least violence to settled law.

Nor is the issue whether sex discrimination is prohibited. It is. Nor is the issue

whether some jurors might award damages for this conduct. They well may. The issue is whether the facts of this case, as viewed for purposes of summary judgment, reach the level of conduct defining the tort of intentional infliction of emotional distress. It appears the majority and concurring opinions hold that all conduct constituting discrimination is encompassed within that definition. As abhorrent as discrimination is, I suggest the definition of the tort was not intended to encompass *all* discriminating conduct. But, under the majority opinion, it appears to me we will have no choice but to submit the question to the jury.

As the above discussion reveals, I am apprehensive that the precedent established by the majority opinion will make nearly every accusation of intentional infliction of emotional distress a jury question in the hope that the jury, out of sympathy if nothing else, will agree with the plaintiff that the defendant's conduct goes beyond all possible bounds of decency. If that is indeed the case, we have either a more "decent" society than I imagined or the jury verdicts will be unwarranted. The law defining the tort is surely more principled. Courts do decide whether given facts meet certain definitions. *See, e.g., McLean v. Kirby Co.*, 490 N.W.2d 229 (N.D.1992) [as a matter of law independent contractor's work involved a peculiar unreasonable risk of physical harm].

It is unfortunate that the majority needs to seek a vehicle whereby Swenson may recover damages from Krabseth for his alleged conduct toward her. The Legislature has properly designed a remedy which, if it had been available to Swenson at the time of the alleged conduct, would compensate her upon proof of her allegations. *See* §§ 14–02.4–19, 14–02.4–20, NDCC. For the reason stated in the majority opinion, this law is not available to Swenson; but that does not justify the transformation of the cause of action for intentional infliction of emotional distress into a remedy for that unavailability.

I respect the majority's position on this matter as well as that of the special concur-

rence. I cannot, in all good conscience, join these positions. I would affirm the summary judgment on the issue of intentional infliction of emotional distress.