**SECURITY NATIONAL BANK,
EDGELEY, North Dakota,
Plaintiff and Appellee,**

v.

**Allen WALD and Debra Sue Wald,
Defendants and Appellants.**

Civ. No. 930018.

Supreme Court of North Dakota.

Aug. 29, 1995.

Roger J. Minch, of Serkland, Lundberg, Erickson, Marcil & McLean, Ltd., Fargo, for plaintiff and appellee.

Thomas A. Dickson, of Thomas A. Dickson, P.C., Bismarck, for defendants and appellants. Appearance by Debra Wald, appellant.

VANDE WALLE, Chief Justice.

Allen and Debra Sue Wald appealed from a final judgment which, in part, dismissed

their first amended counterclaim against Security National Bank and denied their motion to file a second amended counterclaim. We affirm in part, reverse in part, and remand for further proceedings.

In 1990 and 1991 the Walds and Security National executed four promissory notes in which Security National loaned the Walds about $350,000, and the Walds gave Security National a security interest in certain personal property, including their farm equipment and 1990 crop. By May 1991, the Walds had defaulted on the promissory notes, and Security National sued them, seeking a judgment of $151,960.94 and foreclosure of its security interest in the personal property.

The Walds initially filed a pro se answer, generally denying Security National's allegations. Later, the district court allowed the Walds, through counsel, to file an amended answer and counterclaim, which alleged, in substance, that the parties' security agreement covered a combine and proceeds from the combine; that during the 1991 harvest, the combine was destroyed by fire and a check for insurance proceeds was issued jointly to Security National and the Walds; and that Security National "intentionally, maliciously and in bad faith" attempted to prevent the Walds from finishing their 1991 harvest by refusing to release the insurance proceeds so the Walds could obtain a replacement combine. The Walds characterized their counterclaim as a tort action for bad faith and for intentional infliction of emotional distress.

After further discovery, the Walds moved to file a second amended answer and counterclaim, which alleged, in substance, that Security National had breached a written agreement to subordinate its security interest so the Walds could obtain a loan from the Bank of North Dakota. The district court denied the Walds' motion to file a second amended counterclaim, granted Security National's motion for summary judgment on the underlying debt, and allowed the parties ad-

ditional time to submit supplemental materials on the Walds' first amended counterclaim. Instead of filing supplemental materials, the Walds moved to dismiss without prejudice their first amended counterclaim, and they filed a separate action against Security National, asserting the claims presented in their first and second amended counterclaims.[1] Meanwhile, in this action, the court granted Security National summary judgment on the Walds' first amended counterclaim. Final judgment was entered granting Security National recovery from the Walds on the underlying debt, dismissing with prejudice the Walds' first amended counterclaim, and denying the Walds' motion to file a second amended counterclaim.

The Walds contend that the district court erred in granting summary judgment on their first amended counterclaim. They argue that genuine issues of material fact exist on their claims for the tort of bad faith and for intentional infliction of emotional distress. Security National responds that the Walds' first amended counterclaim raised no genuine issues of material fact, because the bank had no duty to the Walds to release the insurance proceeds from the combine.

■ Summary judgment under N.D.R.Civ.P. 56 is appropriate if, after viewing the evidence in the light most favorable to the opposing party, there are no genuine issues of material fact or conflicting inferences which reasonably can be drawn from undisputed facts, or if the only issues to be resolved are questions of law. *E.g., Hummel v. Mid Dakota Clinic, P.C.,* 526 N.W.2d 704 (N.D.1995). A party seeking summary judgment must initially show the absence of a genuine issue of material fact. *Union State Bank v. Woell,* 434 N.W.2d 712 (N.D.1989). Once the movant has met that initial burden, the party opposing the motion may not rest on mere allegations or denials in pleadings, but must present competent admissible evidence by affidavit or other comparable means to show the existence of a genuine issue of material fact. *Weiss, Wright, Paul-*

---

1. That action is pending before a different judge   in the district.

*son & Merrick v. Stedman,* 507 N.W.2d 901, 903 (N.D.1993).

In *Woell,* we considered the viability of a tort action for the breach of an obligation of good faith in a commercial context. We held that, assuming the tort existed, summary judgment was proper in that case, because the party asserting the tort had failed to establish the existence of a contract or duty under the Uniform Commercial Code, to which a good-faith obligation could attach. *See also Jerry Harmon Motors, Inc. v. First Nat'l Bank & Trust Co.,* 472 N.W.2d 748 (N.D.1991); *Production Credit Ass'n v. Ista,* 451 N.W.2d 118 (N.D.1990).

■ Similarly, in this case we need not decide whether that tort exists in a commercial context, because, assuming it does, the Walds have presented no evidence by affidavit or otherwise to establish the existence of a contract or duty under the Uniform Commercial Code, to which the good-faith obligation could attach. Security National's reliance on its legal rights and remedies does not constitute bad faith. We conclude the trial court properly granted summary judgment on the Walds' bad-faith claim.

■ Under Section 46, Restatement 2d Torts (1965), the elements of an action for intentional infliction of emotional distress are extreme and outrageous conduct that is intentional or reckless and causes severe emotional distress. *Hummel; Swenson v. Northern Crop Insurance, Inc.,* 498 N.W.2d 174 (N.D.1993); *Muchow v. Lindblad,* 435 N.W.2d 918 (N.D.1989). The threshold element of extreme and outrageous conduct is narrowly limited to outrageous conduct that exceeds " 'all possible bounds of decency.' " *Muchow,* 435 N.W.2d at 924 [quoting Restatement 2d Torts § 46, comment d]. In *Muchow,* 435 N.W.2d at 924, we quoted from comment d:

" 'The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious

or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" ' "

■ In determining whether an actor's conduct is extreme and outrageous, an actor is "never liable ... where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress." Restatement 2d Torts § 46, comment g. *See McCormick v. AT & T Technologies, Inc.,* 934 F.2d 531 (4th Cir. 1991), *cert. denied,* 502 U.S. 1048, 112 S.Ct. 912, 116 L.Ed.2d 813 (1992); *Hayes v. Bakery Confectionery & Tobacco Workers,* 753 F.Supp. 209 (W.D.Ky.1989), *affirmed,* 914 F.2d 256 (6th Cir.1990); *Therrien v. United Air Lines, Inc.,* 670 F.Supp. 1517 (D.Colo. 1987); *Neff v. St. Paul Fire & Marine Ins. Co.,* 304 Ark. 18, 799 S.W.2d 795 (1990); *State Farm Automobile Ins. Co. v. Morris,* 612 So.2d 440 (Ala.1993).

■ The court initially determines if a defendant's conduct may reasonably be regarded as extreme and outrageous. *Swenson; Muchow.* If reasonable people could differ, a plaintiff is entitled to have the trier-of-fact determine whether the conduct is sufficiently extreme and outrageous to result in liability. *Swenson; Muchow.*

In *Muchow* we concluded that, given a police officer's prior experience with the decedent, his investigation of the circumstances of her death and statements to the decedent's family, while inconsiderate and unkind, did not rise to the level of extreme and

outrageous conduct. We held that reasonable persons could not disagree that the police officer's conduct was not extreme and outrageous, and we sustained summary judgment dismissal of the action against the police officer.

In *Swenson,* a majority of this court concluded that allegations that an employer and its agent were guilty of employment discrimination reasonably could be regarded as extreme and outrageous conduct. In that case there were allegations that a supervisor had engaged in gender discrimination against a subordinate employee who the supervisor knew was suffering from a deteriorating emotional condition. The majority held that, under those circumstances, reasonable persons could disagree about whether the defendants' conduct was extreme and outrageous and reversed a summary judgment dismissal.

█ In this case, the allegations against Security National do not rise to the level of extreme and outrageous conduct. Security National was under no obligation to release to the Walds the insurance proceeds from the combine, and its conduct reasonably cannot be regarded as "so extreme in degree" as to be "beyond all possible bounds of decency" or to be "utterly intolerable in a civilized" society. We hold that the court properly granted summary judgment on the Walds' claim of intentional infliction of emotional distress.

The Walds also contend that the court abused its discretion in denying their motion to file a second amended counterclaim, which, in substance, alleged that Security National had breached a written agreement to subordinate its security interest so the Walds could obtain a loan from the Bank of North Dakota. They argue that the second amended counterclaim was based upon information discovered during the course of this action. Security National responds that the court did not abuse its discretion in refusing to allow the Walds to file a second amended counterclaim, because their request was not timely.

In denying the Walds' motion, the court said, in part:

"Well, I'm going to deny the motion to amend. In denying the motion to amend, I'm not making any statement one way or the other as to the validity of the claims, but it seems to me that if there are some valid claims, that could be handled in some separate action."

█ A decision on a motion to amend a pleading under N.D.R.Civ.P. 15(a) is addressed to the sound discretion of the trial court and will not be overturned on appeal absent an abuse of discretion. *First Interstate Bank of Fargo, N.A. v. Rebarchek,* 511 N.W.2d 235 (N.D.1994). A court abuses its discretion if it acts in an arbitrary, unreasonable, or unconscionable manner, or if it misinterprets or misapplies the law. *Knudson v. Director, North Dakota Dep't of Transportation,* 530 N.W.2d 313 (N.D.1995).

█ In this case, part of the court's rationale for denying the Walds' motion to file a second amended counterclaim was that those claims "could be handled in some separate action." However, under N.D.R.Civ.P. 13(a), if a claim arises out of the same "transaction or occurrence that is the subject matter of the opposing party's claim," it is a compulsory counterclaim and must be pleaded in response to the opposing party's pleading. *Klem v. Greenwood,* 450 N.W.2d 738 (N.D.1990); *Dangerud v. Dobesh,* 353 N.W.2d 328 (N.D.1984). The failure to plead a compulsory counterclaim in response to the opposing party's pleading precludes that counterclaim from being raised in a subsequent action. *Klem; Dangerud.* We have construed "transaction or occurrence" broadly to avoid a multiplicity of suits and to mean a claim that is "logically related" to the opposing party's claim. *Leo Lumber Co. v. Williams,* 191 N.W.2d 573, 576 (N.D.1971).

█ Here, the Walds' second amended counterclaim alleges that Security National breached a written agreement to subordinate its security interest so the Walds could obtain a loan from another lender. That counterclaim is "logically related" to Security National's pleading. Their counter-

claim is compulsory and must be raised in response to Security National's pleading or they are precluded from raising it in a subsequent action. In denying the Walds' motion, the trial court did not consider whether their second amended counterclaim was a compulsory counterclaim. To the extent the court's rationale was that those claims "could be handled in some separate action," the court misapplied the law on compulsory counterclaims. Although the court also said the Walds' motion was not timely, we decline to speculate on the effect of its misapplication of the compulsory-counterclaim law on its ultimate denial of the Walds' motion to amend their counterclaim. We conclude the court abused its discretion in misapplying the law on compulsory counterclaims, and we remand for reconsideration of the Walds' motion to file a second amended counterclaim.

We affirm the summary judgment dismissal of the Walds' first amended counterclaim. We reverse the order denying their motion to file a second amended counterclaim and remand for further proceedings consistent with this opinion.

MESCHKE, LEVINE and NEUMANN, JJ., concur.

SANDSTROM, Justice, concurring specially.

The majority partially relies on part III, of *Swenson v. Northern Crop Insurance, Inc.,* 498 N.W.2d 174, 181–87 (N.D.1993). Although I concur in the result reached by the majority, I write separately to express my view that part III of *Swenson* was not the opinion of a constitutional majority of this Court.

*Swenson* was argued on December 16, 1992, and decided on March 24, 1993. The opinion was authored by Ralph J. Erickstad, Surrogate Judge. A footnote states: "Surrogate Judge Ralph J. Erickstad was Chief Justice at the time this case was heard, and served as surrogate judge for this case pursuant to Section 27–17–03, N.D.C.C." *Swenson* at 176 n. 1. The opinion reflects that Justice Meschke concurred in the result; Justice Levine concurred specially and filed opinion; and Chief Justice VandeWalle concurred in parts I and II, dissented to part III, and filed opinion. The opinion further notes:

"Justice J. PHILIP JOHNSON, who was a member of the Court when this case was heard, did not participate in this decision.

"Justice NEUMANN and Justice SANDSTROM, not being members of the Court when this case was heard, did not participate in this decision."

*Swenson* at 187.

A majority of the Supreme Court is necessary to pronounce a decision. N.D. Const. Art. 6, § 4 provides:

"A majority of the supreme court shall be necessary to constitute a quorum or to pronounce a decision, provided that the supreme court shall not declare a legislative enactment unconstitutional unless at least four of the members of the court so decide."

Judges properly called to sit for disqualified justices may constitute part, or all, of the majority. *State ex rel. Linde v. Robinson,* 35 N.D. 410, 160 N.W. 512, 514 (1916) [*Robinson I*].

The Supreme Court consists of the five justices, N.D. Const. Art. 6, § 2, elected by the people. N.D. Const. Art. 6, § 7, provides:

"The justices of the supreme court shall be chosen by the electors of the state for ten-year terms, so arranged that one justice is elected every two years. They shall hold office until their successors are duly qualified, and shall receive compensation as provided by law, but the compensation of any justice shall not be diminished during his term of office."

As of January 1, 1993, the duly elected and qualified Supreme Court consisted of Justices VandeWalle, Meschke, Levine, Neumann, and Sandstrom.

A former justice, as such, retains no residual power to act, any more than a former governor or public service commissioner. See State ex rel. Spaeth v. Olson ex rel. Sinner, 359 N.W.2d 876 (N.D.1985). State ex rel. Spaeth v. Olson determined whether Allen I. Olson or George A. Sinner was Governor of North Dakota during the first days of 1985. This Court, in an opinion authored by then Chief Justice Erickstad, wrote:

"[O]fficials 'who prior to January 1, 1981, have taken, subscribed, and filed with the Secretary of State their oaths of office shall have qualified and without the necessity of any further act shall, at the earliest moment of January 1, 1981, become the incumbents of the offices for which they have been elected, and the possessors of all the powers, duties, and responsibilities of the said offices.'

* * *

"Based upon the foregoing reasoning, we hold that George A. Sinner is currently, and has been since the first moment of January 1, 1985, the Governor of the State of North Dakota. We therefore grant an original writ enjoining Olson from exercising the powers and duties of the Office of Governor of the State of North Dakota."

Olson at 883–84. The issue was not without great consequence. Had Olson been entitled to continue to act, he would have filled two vacancies on this Court, which were subsequently filled by the appointments of Governor Sinner.

Following the elections of 1916, a similar dispute arose as to who constituted a majority of this Court. Robinson I and State ex rel. Linde v. Robinson, 35 N.D. 417, 160 N.W. 514 (1916) [Robinson II]. Three newly elected justices contended they took office on the first Monday in December as had been provided for the first justices elected after statehood; the outgoing justices contended they continued to serve until the first Monday in January, as statute then provided for state officers. Robinson I and II. The Attorney General asked the Court to decide the issue so there would be no question as to the validity of judgments and orders that might be issued on pending cases during the disputed period. Robinson I, 160 N.W. at 512. The Court, ultimately consisting totally of district judges, following the justices' declarations of disqualification, held the terms and tenures of justices are governed by the same provisions as other state officers. Robinson II, 160 N.W. at 515, 518.

A retired justice may be designated as a surrogate judge and may sit on the supreme Court only as provided by the Constitution. N.D. Const. Art. 6, § 11:

"When any justice or judge has a conflict of interest in a pending cause or is unable to sit in court because he is physically or mentally incapacitated, the chief justice, or a justice acting in his stead, shall assign a judge, or retired justice or judge, to hear the cause."

None of the specified grounds existed in Swenson. No justice filed a disqualification. There was no assignment of the former Chief Justice to act for a justice with a conflict of interest or for a justice physically or mentally incapacitated.

The former Chief Justice was not a member of the Court at the time of the decision, and he was not serving by assignment. Only two of those entitled to act concurred in any manner to part III. Thus a majority did not pronounce a decision in part III of Swenson.

N.D.C.C. § 27–02–22 provides:

"The concurrence of a majority of the judges of the supreme court is necessary to pronounce judgment. If a majority does not concur, the case must be reheard, but no more than two rehearings may be had. If on the second rehearing a majority of the judges does not concur, the judgment must be affirmed."

Finally, I note that part III of Swenson is apparently the only "transitional" opinion of this Court lacking a Constitutional majority.

NEUMANN, J., concurs.