2001 ND 73

**Joyce DAHLBERG, Plaintiff and Appellant,**

v.

**LUTHERAN SOCIAL SERVICES OF NORTH DAKOTA, and Mary J. Weiler, Defendants and Appellees.**

**No. 20000152.**

Supreme Court of North Dakota.

April 17, 2001.

Timothy P. Hill, Hill Law Office, Fargo, for plaintiff and appellant.

Benjamin E. Thomas, Wold Johnson, P.C., Fargo, for defendants and appellees.

MARING, Justice.

[¶ 1]   Joyce Dahlberg appealed from a summary judgment [1] dismissing her claims against Lutheran Social Services of North Dakota and Mary J. Weiler for breach of contract, retaliatory discharge, and intentional infliction of emotional distress.  We hold Lutheran Social Services was not contractually required to follow a progressive discipline policy in terminating Dahlberg's employment;  the defendants' conduct was not so extreme and outrageous as to satisfy the threshold requirement for a claim for intentional infliction of emotional distress;  and Dahlberg failed to establish a prima facie case for retaliatory discharge under N.D.C.C. § 34–01–20.  We affirm.

I

[¶ 2]   In May 1996, Lutheran Social Services hired Dahlberg for an unspecified term as a therapeutic recreational therapist at Luther Hall, a residential treatment center for troubled children and adolescents.  Dahlberg's duties at Luther Hall included organizing recreational activities for the residents.

[¶ 3]   When Lutheran Social Services hired Dahlberg, she received an Employee Handbook which stated:

> The LSS Employee Handbook is provided for use by agency employees.  This Handbook is not intended to be a contract.  Interpretation of information

---

1.  Dahlberg's notice of appeal says the appeal is from "the Memorandum Opinion on Motion for Summary Judgment and Order granting Defendant's Motion for Summary Judgment."  The trial court's memorandum opinion and order disposed of all of Dahlberg's claims and says it "shall stand as the final judgment of the Court."  The trial court's decision reflects the court intended the memorandum opinion and order to be final, and Dahlberg's appeal is properly before us.  *See Sime v. Tvenge Assocs. Architects & Planners, P.C.*, 488 N.W.2d 606, 608 (N.D. 1992).

contained in this handbook remains the right of the agency. Employees of Lutheran Social Services of North Dakota are employees at will. As such, the employee may resign at any time for any reason, although at least two weeks notice is expected; and, conversely, LSS/ND may terminate the employee for any reason or no reason. Also, if conditions warrant, the agency reserves the right to make changes and/or modifications in the Handbook without notice.

[¶ 4] Dahlberg acknowledged signing an employee handbook receipt and agreement which provided:

I have read and understand the Employee Handbook of Lutheran Social Services of North Dakota and I understand and accept the policies and procedures as part of my employment relationship with the agency. I have received a copy of the Employee Handbook and understand that this handbook or the policies contained in the handbook may be amended from time to time by the agency without notice. It is understood that this handbook does not create a contract and both Lutheran Social Services of North Dakota and I have the right to terminate the employment relationship at any time for any reason, although I agree that wherever possible I will give at least two weeks notice.

[¶ 5] In March 1997, Lutheran Social Services adopted a three-step progressive discipline policy, which defined progressive discipline as a sequence of increasingly serious actions taken in response to unacceptable behavior and said the steps outlined in the procedure were intended to assist employees in correcting work-related performance. The policy identified the three steps of progressive discipline as a first notice, a second notice, and termination. The policy said a supervisor must follow principles of equity in imposing progressive discipline, and the discipline must fit the infraction. The policy said employees must be informed of the action taken and why, and employees must be given the opportunity to respond and explain their behavior. The policy indicated progressive discipline is attempted whenever possible, but serious breaches of conduct may result in immediate suspension without using the progressive discipline procedure.

[¶ 6] On August 19, 1997, Dahlberg was supervising several residents during a recreational activity at Luther Hall. One of the residents left the recreational activity, and Dahlberg pursued that resident, leaving the other residents unattended. Mary Weiler, the Administrative Director of Luther Hall, prepared a summary of the incident and a written statement of employee performance concerns, a first notice under the progressive discipline procedure, which cited lack of judgment related to supervision of residents, leaving the building without communicating supervision needs to the residential specialist, lack of decision making in a crisis situation, and lack of initiative in cooperative working relationships.

[¶ 7] In October 1997, Dahlberg was involved in an incident in which a resident at Luther Hall was found in possession of a confidential list of names and home addresses of Luther Hall staff members. The resident reported she had obtained the list from a drawer in Dahlberg's desk while being supervised by Dahlberg. Weiler investigated the incident, and she prepared a report and a second notice under the progressive discipline procedure, which cited Dahlberg's lack of good judgment regarding supervision of a resident.

[¶ 8] According to Dahlberg, in November 1997 she began making verbal reports to Weiler regarding what Dahlberg "believed to be violations or suspected violations of law pertaining to abuse of resi-

dents." On December 18, 1997, Dahlberg wrote Weiler a letter "concerning inappropriate touching by several residents during different time frames involving supervision by different staff." According to Dahlberg, from December 1997 through the spring of 1998 she persisted in her "insistence that allegations of abuse be investigated," and she began experiencing a marked change in how she was treated by management and her supervisors. She claimed her work environment became "hostile."

[¶ 9] In April 1998, Dahlberg was involved in another incident at Luther Hall. According to an April 29, 1998 summary by Amy Dahlin, on April 22 Dahlberg left Luther Hall with a 13–year–old female resident without informing a supervisor, Dahlberg provided the resident with caffeinated pop, and Dahlberg returned the resident twenty to thirty minutes after the resident's scheduled bedtime. On April 29, Weiler suspended Dahlberg without pay until May 7, 1998, when a meeting was scheduled with Dahlberg's immediate supervisor, Brent Larson, to determine her status. Weiler prepared a third written employment performance concern regarding Dahlberg, and Dahlberg was told not to return to Luther Hall during the suspension. However, Dahlberg returned to Luther Hall later on April 29, and talked to some residents. On May 11, 1998, the president of Lutheran Social Services, Tony Ingle, terminated Dahlberg's employment.

[¶ 10] Dahlberg sued Lutheran Social Services and Weiler for breach of contract, retaliatory discharge, and intentional infliction of emotional distress. The trial court granted summary judgment dismissing all three of Dahlberg's claims, and she appealed.

## II

[¶ 11] We review this appeal in the posture of summary judgment, which is a procedural device for the prompt and expeditious disposition of a controversy without a trial if either party is entitled to judgment as a matter of law, and if no dispute exists as to either the material facts or the inferences to be drawn from undisputed facts, or if resolving disputed facts would not alter the result. *Reed v. University of North Dakota*, 1999 ND 25, ¶ 7, 589 N.W.2d 880. On appeal, we review the evidence in the light most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences which reasonably can be drawn from the evidence. *Id.* Although the party seeking summary judgment must initially demonstrate there is no genuine issue of material fact, the party resisting the motion may not simply rely upon the pleadings or upon unsupported conclusory allegations. *Engel v. Montana Dakota Utils.*, 1999 ND 111, ¶ 7, 595 N.W.2d 319. A party resisting a summary judgment motion must present competent admissible evidence by affidavit or other comparable means which raises an issue of material fact, and must, if appropriate, draw the court's attention to relevant evidence in the record raising an issue of material fact. *Id.* Summary judgment is proper against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Id.* Issue of fact may be appropriate for summary judgment if reasonable minds can draw only one conclusion from the evidence. *Opp v. Source One Mgmt., Inc.*, 1999 ND 52, ¶ 16, 591 N.W.2d 101.

## III

[¶ 12] Dahlberg argues she was terminated in violation of her employment con-

tract with Lutheran Social Services. She argues Lutheran Social Services' progressive discipline policy was part of her employment contract, and Lutheran Social Services failed to follow that policy in terminating her.

[¶ 13] Under N.D.C.C. § 34–03–01, employment without a definite term is presumed to be at will, and an at-will employee may be terminated with or without cause. *See e.g., Jose v. Norwest Bank,* 1999 ND 175, ¶ 10, 599 N.W.2d 293. By contract, however, the parties may modify the at-will presumption and define their contractual rights regarding termination. *Thompson v. Associated Potato Growers, Inc.,* 2000 ND 95, ¶ 8, 610 N.W.2d 53. An employer may contractually modify the at-will presumption with an employee handbook or personnel policy manual. *Eldridge v. Evangelical Lutheran Good Samaritan Soc.,* 417 N.W.2d 797, 799–800 (N.D.1987).

[¶ 14] The construction of an employment contract to determine its legal effect is a question of law, and on appeal, we will independently examine and construe the contract to determine if the trial court erred in its interpretation. *Eldridge,* 417 N.W.2d at 799. We construe employment contracts, including handbooks and policies, as a whole to determine the parties' intent. *See Jose,* 1999 ND 175, ¶ 11, 599 N.W.2d 293; *Olson v. Souris River Telecomms. Co-op., Inc.,* 1997 ND 10, ¶ 8, 558 N.W.2d 333; *Bykonen v. United Hospital,* 479 N.W.2d 140, 141 (N.D. 1992); *Eldridge,* 417 N.W.2d at 799; *Bailey v. Perkins Rests., Inc.,* 398 N.W.2d 120, 121 (N.D.1986). An explicit and conspicuous disclaimer in an employee personnel policy manual, stating no contract rights exist or the policies are not intended to create contractual rights, demonstrates the employer's intent that the manual is only a guide for the employee. *See Jose,* at ¶ 11;

*Bykonen,* at 142; *Eldridge,* at 800–01; *Bailey,* at 123.

[¶ 15] Dahlberg's employment at Lutheran Social Services was for an indefinite term and was presumed to be at will under N.D.C.C. § 34–03–01. Lutheran Social Services' employment handbook expressly stated it was "not intended to be a contract," and Lutheran Social Services "may terminate the employee for any reason or no reason." Lutheran Social Services communicated Dahlberg's at-will status to her in an employee handbook and receipt agreement, which Dahlberg acknowledged signing and which said she understood the handbook or policies could be amended without notice, the handbook was not a contract, and both Lutheran Social Services and she had the right to terminate the employment relationship at any time for any reason.

[¶ 16] Dahlberg nevertheless argues Lutheran Social Services' progressive discipline policy creates an ambiguity in her employment relationship, because that policy was promulgated after the employee handbook, it was not specifically incorporated into the handbook, and it did not state it was not a part of the employment contract. Dahlberg argues Lutheran Social Services was contractually bound to follow the progressive discipline policy in terminating her employment.

[¶ 17] Lutheran Social Services' employee handbook specifically said "the agency reserves the right to make changes and/or modifications in the Handbook without notice." The handbook contained a specific and clear disclaimer, stating it was not intended to be a contract and Lutheran Social Services could terminate an employee for any reason or no reason. Dahlberg acknowledged signing an employee handbook receipt with similar language. The progressive discipline policy

was part of Dahlberg's employment relationship with Lutheran Social Services to assist in documenting[2] and correcting her work performance, and the progressive discipline policy did not include any specific language overriding her at-will status. Although Lutheran Social Services could have included a specific disclaimer in the progressive discipline policy, we do not believe that failure raises a reasonable inference that Lutheran Social Services intended the progressive discipline policy to override the at-will presumption preserved in the unambiguous language of the handbook and Dahlberg's signed acknowledgment that she received the handbook. *See Bykonen*, 479 N.W.2d at 142 (stating failure to include disclaimer in policy manual did not raise reasonable inference employer intended to override at-will presumption unambiguously preserved in employee handbook). When the employee handbook and the progressive discipline policy are construed together as a whole, we conclude they unambiguously preserved the at-will presumption. Lutheran Social Services was not contractually bound to follow the progressive discipline policy in terminating Dahlberg, and the trial court did not err in granting summary judgment on her breach of contract claim.

### IV

[¶ 18] Dahlberg argues the trial court erred in granting summary judgment on her claim for intentional infliction of emotional distress. She argues Lutheran Social Services created an environment of intimidation and a workplace of fear and anxiety, which was not part of a normal employment relationship.

[¶ 19] In *Muchow v. Lindblad*, 435 N.W.2d 918, 924 (N.D.1989), we said a claim for intentional infliction of emotional distress requires the plaintiff to show extreme and outrageous conduct which is intentional or reckless and causes severe emotional distress. *See also Kautzman v. McDonald*, 2001 ND 20, ¶ 18, 621 N.W.2d 871; *Security Nat'l. Bank v. Wald*, 536 N.W.2d 924, 927 (N.D.1995); *Hummel v. Mid Dakota Clinic, P.C.*, 526 N.W.2d 704, 710 (N.D.1995). The threshold element of extreme and outrageous conduct is narrowly limited to outrageous conduct that exceeds all possible bounds of decency. *Kautzman*, at ¶ 18; *Wald*, at 927; *Muchow*, at 924. In determining whether or not conduct is "extreme and outrageous," courts consider whether or not the conduct is so extreme in degree as to be beyond all possible bounds of decency or to be utterly intolerable in a civilized society. *Muchow*, at 924 (quoting Restatement 2nd Torts § 46, comment d).

[¶ 20] In *Muchow*, 435 N.W.2d at 924, we quoted from comment d of Restatement 2nd Torts § 46:

"The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency,

---

2. An employer's documentation of an employee's work performance may have significant ramifications for discrimination claims under N.D.C.C. ch. 14–02.4, in which an employer may be required to articulate a legitimate, non-discriminatory reason for adverse employment actions. *See* fn.3, *infra*.

and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

"The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt."

[¶ 21] The court initially decides if a defendant's conduct reasonably may be regarded as extreme and outrageous. *Wald*, 536 N.W.2d at 927; *Muchow*, 435 N.W.2d at 924. If reasonable persons could differ, a plaintiff is entitled to have the trier-of-fact decide whether the conduct is sufficiently extreme and outrageous to result in liability. *Wald*, at 927; *Muchow*, at 924.

[¶ 22] In *Kautzman* 2001 ND 20, ¶ 22, 621 N.W.2d 871, we held the trial court properly granted summary judgment on a claim for intentional infliction of emotional distress against law enforcement officers who shot the plaintiffs' five dogs. We said there was no dispute the officers were unaware the dogs belonged to the plaintiffs and the officers were responding to calls by concerned citizens. *Id.* We said the major dispute was the distance from which the dogs were shot and whether the shootings were actually necessary, and we concluded those circumstances were insufficient to constitute extreme and outrageous conduct by the officers. *Id.*

[¶ 23] In *Wald*, 536 N.W.2d at 928, we held the trial court properly granted summary judgment on a claim for intentional infliction of emotional distress against a bank, because the plaintiffs' allegations that the bank failed to release insurance proceeds to them did not rise to the level of extreme and outrageous conduct. We said the bank was under no obligation to release insurance proceeds to the plaintiffs, and its conduct reasonably could not be viewed as so extreme in degree as to be beyond all bounds of decency or to be utterly intolerable in a civilized society. *Id.*

[¶ 24] In *Muchow*, 435 N.W.2d at 924–25, we held a police officer's investigation of a death and his statements to the decedent's family, while inconsiderate and unkind, did not rise to the level of extreme and outrageous conduct. We concluded reasonable persons could not disagree that the police officer's conduct was not extreme and outrageous, and we affirmed summary judgment dismissal of the claim. *Id.*

[¶ 25] Here, Dahlberg was an at-will employee. Although Dahlberg claims Lutheran Social Services created an environment of hostility toward her, we agree with the trial court that "[t]he nature of any termination is such that it often produces stress and mental anguish in the person being terminated [and] the test is not whether or not the termination was traumatic, but whether or not the termination was outrageous." Dahlberg's conclusory allegations of a hostile work environment are insufficient to raise a factual issue about whether the defendants' conduct was "extreme and outrageous," and she has not pointed to evidence of specific instances in which the defendants' conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be

regarded as atrocious and utterly intolerable in a civilized community. *See Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 439–40 (Minn.1983) (holding employer discipline and written and verbal criticism of employee's job performance not extreme and outrageous).

[¶ 26] Viewing the evidence in the light most favorable to Dahlberg, we conclude reasonable persons could not disagree that the defendants' conduct was not so extreme and outrageous as to satisfy the threshold requirement for intentional infliction of emotional distress. We hold the trial court did not err in granting summary judgment on Dahlberg's claim for intentional infliction of emotional distress.

V

[¶ 27] Dahlberg argues she set forth sufficient grounds to establish a prima facie case for retaliatory discharge under N.D.C.C. § 34–01–20, which prohibits an employer from discharging an employee because the employee in good faith reports a violation or suspected violation of state law to an employer. According to Dahlberg, in November 1997, she verbally reported to Weiler incidents of "inappropriate touching" between 12 to 14–year–old residents of Luther Hall, including masturbation, kissing, holding hands, and one resident physically forcing another resident into inappropriate touching in order to masturbate. Weiler confirmed "[w]hat was reported were incidents of touching, holding hands, one incident I believe of a girl being forced to put her hand in the crotch of a male. There were kissing incidents." Dahlberg wrote Weiler a December 18, 1997 letter about the "inappropriate touching by several residents during different time frames involving supervision by different staff," in which Dahlberg "posed the question of fairness applied under these circumstances in regards to [her]

own letters of reprimand" and stated she was "by no means advocating for reprimanding all parties involved." Rather, Dahlberg indicated the "purpose of [her] letter is to point to unfair treatment and consequences given." Dahlberg's letter explained, "In [the] case of my own letters of reprimand, which I continue to disagree with, the potential for something to happen was present but actually nothing happened" and "[t]he previous mentioned incidents (inappropriate touching) did result in serious offenses. 'Lack of good judgment in the supervision' was definitely present." Dahlberg requested "an official hearing and/or reevaluation by [Weiler's] supervisor Janell Regimbal," and Dahlberg asked to meet with the president of Lutheran Social Services, Tony Ingle. Dahlberg explained her "decision to pursue this matter further is related to pointing to inconsistency and that written incident reports appear to have the tendency to result in letters of reprimand to the staff involved; especially for certain staff."

[¶ 28] According to a January 2, 1998 letter from Weiler to Dahlberg, Weiler met with Dahlberg to discuss Dahlberg's concerns. Weiler's January 1998 letter summarized that meeting:

2. Clarification that when you discussed your concerns with me regarding recent incidents about inappropriate touching by several residents on Friday, December 21, 1997 you were not initiating the resolution of employee concerns. You[r] intent was to discuss the issue of fairness.

3. Your request for a review of your written notices by Janell Regimbal and Tony Ingle.

4. Concerns about the inconsistencies of staff completing written reports regarding the supervision of residents and that when a report is writ-

ten there is a tendency for certain staff to receive a written notice. You indicated there have been seven occasions that you have seen the residents unsupervised. You stated that you took the risk and helped out in these situations. Written reports were not completed by you regarding these seven occasions.

5. Concerns regarding confidentiality and privacy were discussed. You indicated that shortly after you were issued the second written notice you shared this information with two staff members.

As I mentioned to you, in the next week or so I will be reviewing your written notices and our discussions related to your concerns with Janell Regimbal. I am confident this process will clarify your concerns.

[¶ 29] On January 26, 1998, Janell Regimbal, the vice president of youth services at Lutheran Social Services, responded to Dahlberg's request for a review of the two written notices of employee performance concerns:

I have thoroughly reviewed all the written documentation available on the incidents in question. As I discussed with you when we met on January 23, I find the written warnings to be appropriate and have no reason to rescind them at this time. In review of your personnel file, I see that you have placed a written response to the warnings, as is your right.

As we discussed, I will further explore the concern you stated of how and when it is determined that an incident report is filed at Luther Hall, to aid in ensuring uniformity in its usage.

[¶ 30] According to Dahlberg's affidavit, from December 1997 through the spring of 1998 she persisted in insisting the allegations of abuse be investigated. She argues her reports implicated possible violations of the child abuse and neglect law under N.D.C.C. ch. 50–25.1, and possible criminal violations. She claims that, after she reported the possible abuse, she was subjected to a "hostile" work environment and was ultimately terminated in retaliation for making the reports.

[¶ 31] The trial court analyzed Dahlberg's retaliation claim under the burden-shifting framework for federal discrimination claims announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny.[3] The trial court said Dahlberg's reports involved alleged lack of supervision

---

**3.** We have applied a modification of the *McDonnell Douglas* framework to discrimination claims under N.D.C.C. ch. 14–02.4, the North Dakota Human Rights Act. *See Engel*, 1999 ND 111, ¶ 8, 595 N.W.2d 319 (disability claim involving failure to accommodate); *Opp*, 1999 ND 52, ¶ 14, 591 N.W.2d 101 (sexual harassment and retaliatory discharge); *Zimmerman v. Minot Pub. Sch. Dist.*, 1998 ND 14, ¶ 10, 574 N.W.2d 797 (discrimination claim based on physical handicap); *Miller v. Medcenter One, Inc.*, 1997 ND 231, ¶ 11, 571 N.W.2d 358 (sex discrimination); *Schuhmacher v. North Dakota Hosp. Ass'n*, 528 N.W.2d 374, 378–83 (N.D.1995) (age discrimination); *Schweigert v. Provident Life Ins. Co.*, 503 N.W.2d 225, 227–29 (N.D.1993) (sex discrimination); *Moses v. Burleigh Cty.*, 438 N.W.2d 186, 189 n. 3 (N.D.1989) (sex and race discrimination).

This case does not involve allegations of Human Rights Act violations; rather, it concerns allegations of retaliatory discharge under N.D.C.C. § 34–01–20. In the trial court and their appellate briefs to this Court, the parties did not raise an issue about the effect of *Schweigert* on allegations of retaliatory discharge under N.D.C.C. § 34–01–20. The trial court did not apply the *Schweigert* modification of federal law to this case, and because we conclude Dahlberg has not established a prima facie case for retaliation, we need not decide the applicability of *Schweigert* to a claim for retaliation under N.D.C.C. § 34–01–20.

by Luther Hall employees, which resulted in resident-on-resident sexual abuse, but the court decided Dahlberg had no legal duty to report the alleged "inadequate supervision." The court decided Dahlberg failed to show the existence of protected activity which was prior in time to an adverse employment decision, and she failed to establish a prima facie case for retaliation. The court alternatively assumed Dahlberg established a prima facie case for retaliation, and concluded Lutheran Social Services had legitimate, non-discriminatory reasons for the termination and Dahlberg had provided no evidence from which a rational trier of fact could conclude the termination was pretextual.

[¶ 32] Although at-will employees generally may be discharged at any time for any reason, we have recognized limited, public policy exceptions to the at-will presumption if employees establish they were terminated in retaliation for complying with a clear public policy. *See Ressler v. Humane Soc.*, 480 N.W.2d 429, 432 (N.D. 1992) (holding public policy prohibited employer from discharging employee in retaliation for honoring subpoena and informing employer she was prepared to testify contrary to employer's interest in criminal proceeding); *Krein v. Marian Manor Nursing Home*, 415 N.W.2d 793, 795 (N.D.

1987) (holding public policy prohibited employer from discharging employee in retaliation for seeking workers compensation benefits). *Compare Jose*, 1999 ND 175, ¶ 21, 599 N.W.2d 293 (holding employees identified no clear public policy which their termination violated); *Lee v. Walstad*, 368 N.W.2d 542, 547 (N.D.1985) (same).

[¶ 33] In 1993, the North Dakota Legislature enacted a whistle-blower statute, which is now codified in N.D.C.C. § 34–01–20(1) and provides "[a]n employer may not discharge ... an employee ... because ... [t]he employee ... in good faith, reports a violation or suspected violation of federal or state law or rule to an employer or to a governmental body or law enforcement official." 1993 N.D. Sess. Laws ch. 346, § 1. Under the 1993 enactment, an employer who willfully violated that statute was guilty of an infraction. 1993 N.D. Sess. Laws ch. 346, § 1. In 1997, the Legislature enacted N.D.C.C. § 34–01–20(3), which authorizes an employee asserting a retaliatory discharge to bring a civil action for injunctive relief or damages, and N.D.C.C. § 34–01–20(4), which allows the department of labor to receive complaints about violations of the statute and to attempt to obtain voluntary compliance with it. 1997 N.D. Sess. Laws ch. 291 § 1.[4]

4. The 1997 legislative history says the 1997 enactment was intended to provide "employee protection teeth [beyond] only [the] criminal penalty for the employer," and the provisions authorizing a civil action were based on Montana law. *Hearing on H.B. 1468 Before House Judiciary Committee*, 55th N.D. Legis. Sess. (Feb. 3, 1997) (testimony of Representative John Mahoney).

The Montana law, *see* Mont.Code Ann. § 39–2–901 et seq., generally outlines a remedy for wrongful discharge from employment. *See* Mont.Code Ann. §§ 39–2–902, 39–2–905 to 39–2–915. Our substantive provisions outlining the elements of a retaliatory discharge claim, *see* N.D.C.C. § 34–01–20(1), were en-

acted in 1993 and are different from the substantive provisions in Mont.Code Ann. § 39–2–904, which says:

a discharge is wrongful only if:

(1) it was in retaliation for the employee's refusal to violate public policy or for reporting a violation of public policy;

(2) the discharge was not for good cause and the employee had completed the employer's probationary period of employment; or

(3) the employer violated the express provisions of its own written personnel policy.

The Montana Supreme Court has construed Mont.Code Ann. § 39–02–904(2) as impliedly repealing the at-will presumption for non-probationary employees. *See Whidden v.*

[¶ 34] The plain language of N.D.C.C. § 34–01–20, authorizes an employee to bring a civil action for retaliatory discharge if an employer discharges the employee because the employee "in good faith, reports a violation or suspected violation of federal or state law or rule to an employer or to a governmental body or law enforcement official." Section 34–01–20(1), N.D.C.C., is consistent with caselaw stating an employee's prima facie case for retaliatory discharge requires the employee to show (1) the employee engaged in protected activity; (2) the employer took adverse action against the employee; and (3) the existence of a causal connection between the employee's protected activity and the employer's adverse action. *See Opp*, 1999 ND 52, ¶ 23, 591 N.W.2d 101 (stating "[t]o establish a prima facie case of retaliatory discharge, a plaintiff must introduce probative evidence that he or she (1) opposed an unlawful employment practice, (2) the employer took adverse employment action, and (3) a causal connection exists between the adverse employment action and the protected activity"). *See e.g., Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1394 (10th Cir.1997); *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1313 (7th Cir.1989); *Don-*

*nellon v. Fruehauf Corp.*, 794 F.2d 598, 600–01 (11th Cir.1986); *Irvin v. Airco Carbide*, 837 F.2d 724, 727 (6th Cir.1987); *Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir.1980); *Shallal v. Catholic Soc. Servs.*, 455 Mich. 604, 566 N.W.2d 571, 574 (1997); *Hubbard*, 330 N.W.2d at 444; *Rothmeier v. Investment Advisers, Inc.*, 556 N.W.2d 590, 592 (Minn.App.1996). *See generally* 1 Lex K. Larson, *Unjust Dismissal* § 6.08 (2000).

[¶ 35] To establish a prima facie case for retaliatory discharge under N.D.C.C. § 34–01–20(1), Dahlberg must show she engaged in protected activity and that activity was causally related to her termination on May 11, 1998. Under our statutory formulation of the substantive basis for a retaliatory discharge claim, an employee's good faith report to the employer of a violation or suspected violation of federal or state law is protected activity. That statutory formulation is similar to Minnesota's whistle-blower statute. *Compare* N.D.C.C. § 34–01–20(1) *with* Minn. Stat. § 181.932.[5]

[¶ 36] In *Obst v. Microtron, Inc.*, 614 N.W.2d 196, 202 (Minn.2000), the Minneso-

---

*John S. Nerison, Inc.*, 294 Mont. 346, 981 P.2d 271, 1999 MT 110, ¶ 21.

**5.** Minn.Stat. § 181.932(1) provides:

An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:

(a) the employee, or a person acting on behalf of an employee, in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official;

(b) the employee is requested by a public body or office to participate in an investigation, hearing, inquiry;

(c) the employee refuses an employer's order to perform an action that the employee

has an objective basis in fact to believe violates any state or federal law or rule or regulation adopted pursuant to law, and the employee informs the employer that the order is being refused for that reason; or

(d) the employee, in good faith, reports a situation in which the quality of health care services provided by a health care facility, organization, or health care provider violates a standard established by federal or state law or a professionally recognized national clinical or ethical standard and potentially places the public at risk of harm.

Under Minn.Stat. § 181.935, an employee injured by a violation of Minn.Stat. § 181.932 may bring a civil action to recover any and all damages recoverable at law.

ta Supreme Court construed the reporting requirement of its whistle-blower statute:

> In order to determine whether a report of a violation or suspected violation of law is made in good faith, we must look not only at the content of the report, but also at the reporter's purpose in making the report. The central question is whether the reports were made for the purpose of blowing the whistle, i.e., to expose an illegality. *See* Minn.Stat. § 181.932, subd. 1(a). We look at the reporter's purpose at the time the reports were made, not after subsequent events have transpired. *See generally Wolcott v. Champion Intern. Corp.*, 691 F.Supp. 1052, 1059 (W.D.Mich.1987) (holding that the good faith requirement of the whistle-blower statute was not met where the purpose of the employee, at the time of the making of reports, was not to protect the public, but to protect the jobs of himself and his co-workers). In part, the rationale for looking at the reporter's purpose at the time the report is made is to ensure that the report that is claimed to constitute whistle-blowing was in fact a report made for the purpose of exposing an illegality and not a vehicle, identified after the fact, to support a belated whistle-blowing claim.

In *Obst,* at 203, the court concluded a former employee's report that the employer was shipping defective wiper control modules to a car manufacturer did not constitute a good faith report under Minnesota's whistle-blower statute, because at the time the report was made, the manufacturer was aware the employer was shipping the defective modules and the employee's purpose was to inform the manufacturer of a contractual violation of the testing requirements of a control plan and not to expose illegality. The court also concluded the employee's report that the employer was deviating from established testing procedures did not implicate a violation of law. *Id.* at 204. The court held, as a matter of law, the employee's reports did not constitute good faith reports under Minnesota's whistle-blower statute. *Id.* at 203–04.

[¶ 37] In *Rothmeier,* 556 N.W.2d at 593, the Minnesota Court of Appeals considered whether an employee's mentioning of a SEC registration issue constituted a report under Minnesota's whistle-blower statute. There, the employee was the investment manager for an investment banking group which had been losing money. During a March 15, 1993 meeting, the employee "brought up the issue" of whether the employer's subsidiary should have been registered with the SEC under federal law. *Id.* at 592. The employer fired the employee two days later. *Id.* The employee conceded he learned about the employer's suspected violation of the law from an internal memorandum that showed the supervisor and corporate counsel were aware of the suspected violation and were investigating the issue. *Id.* at 593. The court recognized Minnesota's whistle-blower statute did not require an employer to be ignorant of a suspected violation before an employee makes a report, but the court held, as a matter of law, the employee's "mere mention of that issue to [the employer] did not constitute a 'report' " because the employee knew his employer was already aware of the potentially illegal conduct. *Id.*

[¶ 38] We agree with the Minnesota courts' interpretation of its substantively similar provisions for a retaliatory discharge claim. Section 34–01–20, N.D.C.C., was obviously intended to prohibit an employer from discharging an employee because the employee makes a good faith report to the employer of a violation or suspected violation of state law. The clear purpose of N.D.C.C. § 34–01–20 is to

protect employees who expose illegalities in the workplace, and we are not persuaded N.D.C.C. § 34–01–20 was intended to protect an employee who acts for a purpose other than exposing an illegality. We construe N.D.C.C. § 34–01–20 to require a "report" to be made for the purpose of blowing the whistle to expose an illegality, and the reporter's purpose must be assessed at the time the report is made.

[¶ 39] Here, according to Dahlberg, in November 1997, she made verbal reports to Weiler regarding what Dahlberg "believed to be violations or suspected violations of law pertaining to abuse of residents" at Luther Hall, and Dahlberg wrote Weiler a December 18, 1997 letter outlining concerns about "inappropriate touching" .between residents at Luther Hall. Dahlberg claims her reports to Weiler were protected activity, because the reports complied with Lutheran Social Services' reporting procedures and the residents' conduct "had implications of being in violation of North Dakota's Child Abuse and Neglect Laws and possibly triggering the criminal code." [6] She argues the "public interest is at stake when resident abuse may warrant assault charges."

[¶ 40] Dahlberg testified in her deposition that she did not personally observe any of the incidents of "inappropriate touching," and she obtained most of the information on those incidents from a "log writing 11/19/97, page 44 through 54," or from other Luther Hall employees. Dahlberg does not dispute the "log" is a "communication log where all the events of the day are recorded," and the communication log is "an open record to all the [Luther Hall] staff people." Dahlberg also does not dispute that the defendants were aware of the incidents of "inappropriate touching" when Dahlberg made her November and December 1997 statements to Weiler. Moreover, Dahlberg's November and December 1997 statements to Weiler about "inappropriate touching" were in the context of questioning disparate internal discipline against Luther Hall employees for inadequate supervision of residents and only incidentally implicated potential violations of state law. *See Obst,* 614 N.W.2d at 202–03; *Rothmeier,* 556 N.W.2d at 593. Dahlberg's contemporaneously documented purpose for her statements to Weiler was not to expose any potential violations of law; rather, her stated purpose was to question disparate internal discipline of Luther Hall employees for inadequate su-

6. Section 50–25.1–09.1, N.D.C.C., prohibits an employer from retaliating against an employee because the employee in good faith reported to the department of Human Services, or its designee, reasonable cause to suspect a child was abused or neglected, and authorizes a civil action for all damages, including exemplary damages, costs of litigation, and reasonable attorney fees. Under N.D.C.C. § 50–25.1–09.1(3), there is a rebuttable presumption that any adverse employer action within ninety days of a report is retaliatory. Section 50–25.1–02(2) and (8), N.D.C.C., define an abused and a neglected child for purposes of those reporting requirements. Under N.D.C.C. § 50–25.1–02(8), a "neglected child" means a deprived child under N.D.C.C. ch. 27–20. Under N.D.C.C. § 50–25.1–02(2), an "abused child" is a child who is suffering from serious physical harm or traumatic abuse caused by other than accidental means by a person responsible for the child's welfare." Under N.D.C.C. § 50–25.1–02(1), a person responsible for the child's welfare means "the child's parent, guardian, or foster parent; an employee of a public or private school or nonresidential child care facility; an employee of a public or private residential home, institution, or agency; or a person responsible for the child's welfare in a residential setting."

According to Dahlberg, none of the incidents of inappropriate touching involved Luther Hall employees physically or sexually abusing residents, and she has not argued the presumption in N.D.C.C. § 50–25.1–09.1(3) is applicable to this case.

pervision. We decline to extend Dahlberg's clearly documented purpose for her statements into a vehicle for a belated whistle-blowing claim.

[¶ 41] Dahlberg's affidavit also included conclusory assertions that from December 1997 through the spring of 1998, she persisted in insisting the allegations of abuse be investigated. However, she has not pointed the trial court or this Court to any different "reports [of] a violation or suspected violation of federal or state law" after her November and December 1997 statements to Weiler. Dahlberg alludes to a report the morning of April 29, 1998, the date of her third writeup, which she claims raised concerns about resident supervision. That incident involved a "concern about cement glue being found in one of the resident's rooms," and Dahlberg has not articulated how that incident implicated a violation or suspected violation of law under N.D.C.C. § 34–01–20.

[¶ 42] A party resisting a summary judgment motion must present competent admissible evidence which raises an issue of material fact, and must, if appropriate, draw the court's attention to relevant evidence in the record raising an issue of material fact. *Engel*, 1999 ND 111, ¶ 7, 595 N.W.2d 319. Summary judgment is proper against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial. *Id.* Dahlberg had the burden of establishing a prima facie case of retaliatory discharge. Viewing the evidence in the light most favorable to Dahlberg, we conclude her statements to Weiler about "inappropriate touching" do not constitute "reports [of] a

violation or suspected violation of federal or state law or rule to an employer" under N.D.C.C. § 34–01–20(1). On this record, we conclude reasonable minds could only conclude Dahlberg's statements to Weiler were made for the purpose of questioning disparate discipline of staff for incidents of inadequate supervision and not for the purpose of reporting an illegality. Because Dahlberg failed to establish a prima facie case for retaliatory discharge under N.D.C.C. § 34–01–20, we conclude the trial court did not err in granting summary judgment dismissing her claim for retaliatory discharge.[7]

[¶ 43] We affirm the summary judgment.

[¶ 44] VANDE WALLE, C.J., KAPSNER and NEUMANN, JJ., and WILLIAM W. McLEES, D.J.

[¶ 45] The Honorable McLEES, D.J., sitting in place of SANDSTROM, J., disqualified.

---

7. Because we have concluded Dahlberg's statements to Weiler were not protected reports under N.D.C.C. § 34–01–20, we do not consider whether she presented competent admissible evidence to raise a genuine issue of material fact about a causal connection between her statements and her May 11, 1998 termination.